# 24-2976-cv

## United States Court of Appeals

### *for the*

## Second Circuit

———————

GODWIN BOATENG,

*Plaintiff-Appellee,*

— v. —

BMW OF NORTH AMERICA, LLC, BMW MANUFACTURING CO., LLC,
BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT,
a German Corporation,

*Defendants-Appellants,*

BMW OF NORTH AMERICA, INC., BMW (US) HOLDING CORPORATION,
BMW GROUP, KIEKERT AG,

*Defendants.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLANTS

PHILIP SEMPREVIVO
BIEDERMANN HOENIG SEMPREVIVO P.C.
*Attorneys for Defendants-Appellants*
One Grand Central Place, 36th Floor
60 East 42nd Street
New York, New York 10165
(646) 218-7560

## FEDERAL RULE OF APPELLATE PROCEDURE 26.1
## <u>CORPORATE DISCLOSURE STATEMENT</u>

Defendant-Appellant BAYERISCHE MOTOREN WERKE AG has no corporate parent, nor does any publicly held corporation own 10% or more of its stock.

The following is a list of Defendant-Appellant BMW OF NORTH AMERICA, LLC's corporate parents, and any publicly held corporations owning 10% or more of its stock: BMW (US) Holding Corp. – Parent.

The following is a list of Defendant-Appellant BMW MANUFACTURING CO., LLC's corporate parents, and any publicly held corporations owning 10% or more of its stock: BMW (US) Holding Corp. – Parent.

## **<u>TABLE OF CONTENTS</u>**

**Page**

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT OF SUBJECT MATTER AND APPELLATE
      JURISDICTION ..........................................................................1

STATEMENT OF THE ISSUES................................................................2

STATEMENT OF THE CASE....................................................................2

SUMMARY OF THE ARGUMENT ..........................................................5

APPELLATE STANDARD OF REVIEW....................................................6

ARGUMENT ............................................................................................7

     I.     THIS COURT SHOULD REVERSE THE DISTRICT
           COURT AND GRANT BMW A DIRECTED VERDICT ON
           THE GBL 349 CLAIM ........................................................7

          A.     Standard for Renewed Directed Verdict Motion ........................8

          B.     The Trial Evidence Was Insufficient to Find GBL 349
               Liability .........................................................................9

               i.     BMW's Warnings Were Not Misleading to a
                    Reasonable Consumer Acting Reasonably, Nor
                    Was Boateng Himself Misled...........................................9

               ii.     There Was No Material Omission or
                    Concealment, Because BMW Provided
                    Appropriate Warnings ....................................................13

               iii.     BMW Could Not Warn of That Which It Did
                      Not Know; There Is No Proof that Soft
                      CloseDoors Increase the Risk of Amputations..............17

                   a.     BMW's Knowledge..............................................18

                   b.     The Other Complaints .........................................22

                   c.     The Prevalence of Car Door Injuries,
                      With or Without Soft Close..................................23

                   d.     The Safety Benefits of Soft Close ........................24

i

iv. In Any Case, the Low Volume of Customer Claims Could Not Be Said to Rise to the Level of a Material Omission ...................................................28

v. Any GBL 349 Omission Did Not Cause Boateng's Injury ...........................................................31

vi. The Putative Discrepancy in Numbers of Claims Cannot Support the GBL 349 Claim .............................34

C. Affirming the District Court's Ruling Would Create a New and Impracticable GBL 349 Standard for Product Manufacturers ....................................................37

II. THE COURT SHOULD GRANT BMW A NEW TRIAL ON THE GBL 349 CLAIM, PURSUANT TO RULE 59 .........................38

A. The GBL 349 Verdict Is Against the Weight of Evidence ..................................................................38

B. BMW Was Prejudiced by Boateng's Use, Over BMW's Objections and the District Court's Pretrial Rulings, of a Discovery Dispute to Manufacture a Putative Deception Under GBL 349 .........................................40

III. THE COURT SHOULD GRANT BMW'S REQUEST FOR REMITTITUR OR A NEW DAMAGES TRIAL ...............................44

A. The Damages Awarded by the Jury Are Excessive and Warrant Remittitur or a New Trial on Damages .....................44

i. The Past Lost Wages Award Lacks Support in the Trial Record ...........................................................45

ii. The Past and Future Pain and Suffering Awards Are Excessive ................................................................51

CONCLUSION .........................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Altamuro v. Cnty. of Nassau,*
  33 F. App'x 556 (2d Cir. 2002) ....................................................................6

*Beh v. Jim Willis & Sons Builders, Inc.,*
  814 N.Y.S.2d 476 (N.Y. App. Div. 2006) ............................................. 45-46

*Bozick v. Conagra Foods, Inc.,*
  No. 19-CV-4045 (LJL), 2022 WL 4561779
  (S.D.N.Y. Sept. 28, 2022) ....................................................... 28, 29, 30

*Brady v. Wal-Mart Stores, Inc.,*
  531 F.3d 127 (2d Cir. 2008) ....................................................................8

*Braynina v. TJX Companies, Inc.,*
  No. 15 Civ. 5897 (KPF), 2016 WL 5374134
  (S.D.N.Y. Sept. 26, 2016) ..................................................................17

*Cameron v. City of New York,*
  598 F.3d 50 (2d Cir. 2010) ..................................................................40

*Carro v. Defendant,*
  JVR No. 133318, 1994 WL 479743 (N.J. Sup. Ct. 1991) ....................57

*Clanton v. Agoglitta,*
  615 N.Y.S.2d 68 (N.Y. App. Div. 1994) ............................................45

*Class v. Steering Wheel Rentals, Inc.,*
  JVR No. 378343, 2000 WL 1515708 (N.Y. Sup. Ct. 1995) ...............56

*Cobb v. Pozzi,*
  363 F.3d 89 (2d Cir. 2004) ....................................................................8

*Conte v. Emmons,*
  895 F.3d 168 (2d Cir. 2018) ....................................................................6

*Daniel v. Mondelez Int'l, Inc.,*
  287 F. Supp. 3d 177 (E.D.N.Y. 2018) ..................................................10

*Davis v. State, of N.Y.,*
  148 A.D.3d 985 (N.Y. App. Div. 2017) ................................................51

*De Witt v. N.Y. State Hous. Fin. Agency*,
    No. 97 Civ. 4651 (SAS), 1999 WL 672560
    (S.D.N.Y. Aug. 26, 1999) ................................................................38

*Del Valle v. White Castle Sys., Inc.*,
    715 N.Y. S.2d 57 (N.Y. App. Div. 2000) ........................................46

*DLC Mgmt. Corp. v. Town of Hyde Park*,
    163 F.3d 124 (2d Cir. 1998) ...........................................................39

*Douglas v. Knott*,
    JVR No. 191410, 1996 WL 777631 (Cal. Sup. Ct. 1993) ............ 56, 58

*Empire Gas Corp. v. Am. Bakeries Co.*,
    646 F. Supp. 269 (N.D. Ill. 1986) ...................................................42

*Fane v. Zimmer, Inc.*,
    927 F.2d 124 (2d Cir. 1991) .............................................................8

*Farrior v. Waterford Bd. of Educ.*,
    277 F.3d 633 (2d Cir. 2002) ...........................................................39

*Gasperini v. Center for Humanities, Inc.*,
    518 U.S. 415 (1996) .................................................................. 44, 45

*Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*,
    8 F. Supp. 3d 467 (S.D.N.Y. 2014) ...................................................9

*Gonzalez v. Delta International Machinery*,
    No. 33704/98, JVR No. 385889, 2001 WL 1136768
    (N.Y. Sup. Ct. Mar. 1, 2001) ..........................................................51

*Hudson v. Lansingburgh Cent. School Dist.*,
    27 A.D.3d 1027 (N.Y. App. Div. 2006) ............................................53

*In re Sling Media Slingbox Advert. Litig.*,
    202 F. Supp. 3d 352 (S.D.N.Y. 2016) ..............................................18

*In re: Gen. Motors LLC Ignition Switch Litig.*,
    No. 14-MD-2543 (JMF), 2015 WL 8130449 (S.D.N.Y. Dec. 3, 2015)..............42

*Johnson pro ami Medvitz v. Dillard's Inc.*,
    JVR No. 440683, 2005 WL 6741960 (Fla. Cir. Ct. 2003) ................57

*Kinneary v. City of New York*,
    601 F.3d 151 (2d Cir. 2010) .............................................................8

iv

*Kramer v. Showa Denko K.K.*,
   929 F.Supp. 733 (S.D.N.Y.1996) ........................................................................45

*Leacock v. Nassau Health Care Corp.*,
   No. 08CV02401JMAGRB, 2018 WL 4560731
   (E.D.N.Y. May 25, 2018) ............................................................................ 38-39

*Leo v. Long Island R. Co.*,
   307 F.R.D. 314 (S.D.N.Y. 2015) .................................................................. 40, 44

*Leonard v. Abbott Lab'ys, Inc.*,
   No. 10-CV-4676 ADS WDW, 2012 WL 764199
   (E.D.N.Y. Mar. 5, 2012) ................................................................................28

*Levine v. Philip Morris Inc.*,
   No. 102765/1998, 2004 WL 2334287
   (N.Y. Sup. Ct. N.Y. Cnty. 2004) ................................................................. 9, 32

*Lodato v. Greyhawk N. Am., LLC*,
   2007 N.Y. Slip Op. 02901 (N.Y. App. Div. Apr. 3, 2007) .................................46

*Manuel v. Pepsi-Cola Co.*,
   No. 17 Civ. 7955 (PAE), 2018 WL 2269247 (S.D.N.Y. May 17, 2018) ............10

*Mformation Techs., Inc. v. Research in Motion Ltd.*,
   No. C 08-04990 JW, 2012 WL 2339762 (N.D. Cal. June 7, 2012) ....................42

*Miller v. Weisel*,
   15 A.D.3d 458 (N.Y. App. Div. 2005) ...........................................................51

*Morales v. Kimberly-Clark Corp.*,
   No. 18-CV-7401 (NSR), 2020 WL 2766050
   (S.D.N.Y. May 27, 2020) ...................................................... 9, 17, 18, 28

*Nelson v. 1683 Unico, Inc.*,
   668 N.Y.S.2d 375 (N.Y. App. Div. 1998) .......................................................46

*New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*,
   295 F.3d 232 (2d Cir. 2002) .............................................................................7

*O & G Industs., Inc. v. National R.R. Passenger*, *Co.*,
   537 F.3d 153 (2d Cir. 2008) ...........................................................................40

*O'Shea v. State*,
   No. 101626, 2007 WL 494635 (N.Y. Ct. Claims Jan. 22, 2007) .......................53

*O'Connor v. Rosenblatt,*
714 N.Y.S.2d 327 (N.Y. App. Div. 2000)..............................................45

*Okemo Mountain, Inc. v. Sikorski,*
303 F. App'x 938 (2d Cir. 2008).......................................................8, 9

*Olsen v. Stark Homes, Inc.,*
759 F.3d 140 (2d Cir. 2014) .................................................................6

*Oswego Laborers' Local 214 Pension Fund v.*
*Marine Midland Bank, N.A.,*
85 N.Y.2d 20 (1995)....................................................................... 9, 17

*Papa v. City of New York,*
598 N.Y.S.2d 558 (N.Y. App. Div. 1993)...........................................46

*Patterson v. Balsamico,*
440 F.3d 104 (2d Cir. 2006) ...............................................................45

*Poturniak v. Rupcic,*
648 N.Y.S.2d 668 (N.Y. App. Div. 1996)...........................................45

*Qiyuan Shi v. Gyamera,*
401 F. Supp. 3d 452 (S.D.N.Y. 2018) .................................................45

*Raedle v. Credit Agricole Indosuez,*
670 F.3d 411 (2d Cir. 2012) ...............................................................39

*Rangolan v. Cnty. of Nassau,*
370 F.3d 239 (2d Cir. 2004) ...............................................................45

*Razzaque v. Krakow Taxi, Inc.,*
656 N.Y.S.2d 208 (N.Y. App. Div. 1997)...........................................46

*Robinson v. N.Y.C. Dep't of Educ.,*
94 A.D.3d 428 (N.Y. App. Div. 2012) ................................................52

*Smith v. Carpenter,*
316 F.3d 178 (2d Cir. 2003) .............................................................6-7

*Solak v. Hain Celestial Grp., Inc.,*
3:17-CV-0704(LEK/DEP), 2018 WL 1870474
(N.D.N.Y. Apr. 17, 2018)...................................................................10

*Solomon v. Bell Atl. Corp.,*
9 A.D.3d 49 (N.Y. App. Div. 1st Dep't 2004) ............................... 9, 32

*St. Patrick's Home for Aged and Infirm v. Laticrete Int'l, Inc.*,
   264 A.D.2d 652 (N.Y. App. Div. 1999) ........................................ 28, 29

*Stutman v. Chem. Bank*,
   731 N.E.2d 608 (N.Y. 2000) ................................................................32

*Taveras v. Vega*,
   119 A.D.3d 853 (N.Y. App. Div. 2014) ............................................51

*Tesser v. Board of Educ. of City Sch. Dist.*,
   370 F.3d 314 (2d Cir. 2004) ...............................................................40

*Torres v. Metro-N. R.R. Co.*,
   No. 20-CV-10782(LJL), 2023 WL 4487726
   (S.D.N.Y. July 12, 2023) ............................................................. 45, 46

*Troncoso v. TGI Friday's Inc.*,
   No. 19 CIV. 2735 (KPF), 2020 WL 3051020
   (S.D.N.Y. June 8, 2020) .....................................................................10

*Tse v. UBS Fin. Servs., Inc.*,
   568 F. Supp. 2d 274 (S.D.N.Y. 2008) ...............................................45

*Turley v. ISG Lackawanna, Inc.*,
   774 F.3d 140 (2d Cir. 2014) ......................................................... 44-45

*Van v. Language Line Servs., Inc.*,
   No. 14-CV-03791- LHK, 2016 WL 3566980
   (N.D. Cal. June 30, 2016) ..................................................................42

*Villalba v. Rockford Sys., Inc.*,
   No. 02-CV-4455(ARR)(RML), 2006 WL 526660
   (E.D.N.Y. Mar. 3, 2006) ....................................................................54

*Wang v. Yum! Brands, Inc.*,
   No. 05-CIV-1783JFBMDG, 2007 WL 1521496
   (E.D.N.Y. May 22, 2007) ............................................................ 45, 46

*Weinstein* v. *eBay, Inc.*,
   819 F. Supp. 2d 219 (S.D.N.Y. 2011) ...............................................10

*Wurtzburger v. Kentucky Fried Chicken*,
   No. 16-CV-08186 (NSR), 2017 WL 6416296
   (S.D.N.Y. Dec. 13, 2017) ..................................................................10

**Statutes & Other Authorities:**

28 U.S.C. § 1291 ................................................................................. 2

28 U.S.C. § 1332 ................................................................................. 1

C.P.L.R. § 5501(c) ............................................................................. 51

Fed. R. Civ. P. 50 .......................................................................... 8, 38

Fed. R. Civ. P. 50(b) .................................................................. 2, 4, 8

Fed. R. Civ. P. 59 ..................................................................... 4, 6, 39

Fed. R. Civ. P. 59(a) ........................................................... 38, 40, 44

Fed. R. Civ. P. 59(a)(1) .................................................................... 38

NEW YORK GENERAL BUSINESS LAW § 349 ................................... *passim*

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

This is an appeal from the final judgment entered on June 26, 2024, and the subsequent Memorandum and Order denying defendants-appellants' Bayerische Motoren Werke AG ("BMW AG"), BMW of North America, LLC ("BMW NA"), and BMW Manufacturing Co., LLC's ("BMW MC") (collectively, "BMW", "Defendants", or "Appellants"), combined post-trial motions for judgment as a matter of law, for a new trial on the plaintiff-respondent's New York General Business Law § 349 ("GBL 349") claim, and for remittitur of the excessive damages awarded to the plaintiff-respondent or a new trial on damages, entered in this action on October 11, 2024, by the United States District Court for the Eastern District of New York. BMW timely filed their Notice of Appeal on November 8, 2024. The federal courts have subject matter jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332. Plaintiff-respondent Godwin Boateng ("Boateng", "Plaintiff", or "Respondent") is a resident and citizen of New York. BMW AG is a German corporation with principal place of business in Germany. BMW NA is a Delaware

LLC with principal place of business in New Jersey. BMW MC is a Delaware LLC, with principal place of business in South Carolina.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because this is an appeal from a final decision of the District Court.

## STATEMENT OF THE ISSUES

1) Did the District Court err by denying BMW's Rule 50(b) motion for a directed verdict dismissing Boateng's GBL 349 claim in the absence of any evidence of a causally related deceptive act?

    Proposed Answer: Yes.

2) Did the District Court err by denying BMW's Rule 59 motion for a new trial on Boateng's GBL 349 claim because the jury's verdict was against the clear weight of the evidence?

    Proposed Answer: Yes.

3) Did the District Court err by denying BMW's Rule 59 motion for remittitur or a new trial on damages?

    Proposed Answer: Yes.

## STATEMENT OF THE CASE

The trial of this product liability matter was held between June 17 and 26, 2024. According to the evidence adduced at trial, on July 6, 2016, Boateng drove his friend Tonya Perry and her young son to Ms. Perry's home at 71 West Oak Street,

Farmingdale, New York. Boateng parked his 2013 BMW X5 (the "Vehicle") on the right side of the street, and stepped out of the Vehicle onto the narrow, residential roadway, which was further narrowed by the presence of another vehicle parked on the opposite curb. While standing in the street, Boateng held the driver's door behind his back, with his back to the door and his right thumb tucked around the edge of the door. He saw a truck approaching from his left. Boateng stepped backward towards his Vehicle, as far back as possible, to avoid making contact with the truck, which ultimately passed within three feet of him. (JA-197, 200, 363 to 364). In the process of this exigent maneuver, in light of his thumb wrapped around the edge of the door, Boateng closed the driver's door onto his right thumb, amputating the tip. Rather than to admit his own fault for the incident, Boateng blamed the Vehicle's "soft close automatic door" option ("soft close") for his injury.

The trial evidence established that "soft close" is an optional feature in BMW vehicles that can only activate when the door is closed to its "secondary" or "prelatch" position. The soft close mechanism then cinches the door fully closed for the final 6 millimeters of travel, compressing rubber weather seals around the door frame to do so. The parties' experts agreed at trial that there exist safety benefits to achieving full closure of vehicle doors; that there is a danger to body parts near vehicle doors any time doors are slammed closed, whether or not they have soft

close; and that the soft close feature obviates the need to slam doors to achieve full closure. (JA-663 to 664).

BMW moved for a directed verdict on all claims after the close of Boateng's case on June 24. (JA-1172 to 1204). BMW orally renewed the motion for directed verdict upon the close of Defendants' case on June 25. (JA-1474 to 1492). The District Court reserved its decision on all claims, and indicated that BMW would have a chance to submit briefing. (JA-1181, 1188, 1249). On June 26, the jury deliberated and returned a verdict dismissing the design defect, failure to warn, and warranty claims against BMW, with the exception that it inexplicably found BMW liable on Boateng's GBL 349 claim. (JA-2663 to 2666). The jury awarded Boateng $255,360 for past loss of earnings, $800,000 for past pain and suffering, and $850,000 for future pain and suffering over a period of 7 years. (JA-2667).

On July 29, 2024, BMW filed its combined post-trial motion renewing its application for directed verdict as to the GBL 349 claim, pursuant to Fed. R. Civ. P. 50(b); and, in the alternative, for a new trial on the GBL 349 claim, pursuant to Fed. R. Civ. P. 59. BMW also moved for remittitur or a new damages trial, pursuant to Fed. R. Civ. P. 59, on the grounds that the damages award is excessive and unsupported by the trial record.

On October 11, 2024, the District Court issued its Memorandum and Order denying all branches of BMW's post-trial motion. (SPA-40 to 141). On November 8, 2024, BMW timely filed its Notice of Appeal. (JA-2927).

## SUMMARY OF THE ARGUMENT

There is no design defect at issue in this appeal. The jury found none. The jury found that no failure to warn proximately caused the accident. The jury also found BMW's soft close feature to be reasonably safe and fit for its ordinary purpose. Rather, the sole question to be determined is whether there was sufficient evidence in the trial record upon which to sustain the jury's finding of GBL 349 liability — a deceptive business act or omission. There was not.

Indeed, the evidence was legally insufficient to support the GBL 349 claim. There was no affirmative 'deception' by BMW, nor was there any material omission. And, although in the briefing to the District Court, Boateng's counsel primarily argued an alleged discrepancy in the number of customer reports was the actionable deception, the District Court rejected that argument and agreed with BMW that it is a legal impossibility for the claims number issue to be the basis for GBL 349 liability.

Instead, however, the District Court independently fashioned a rationale for the GBL 349 verdict that would create a new, impracticable, and clearly unintended, standard for product manufacturers—a standard where manufacturers must disclose

to prospective customers all reported instances of customers claiming to have been injured by the product, or be liable if a future plaintiff ever comes forward claiming to have been injured in a similar manner. The reasoning of the District Court, however, is erroneous on several points, and there is still no proper legal basis for a finding of GBL 349 liability against BMW.

## APPELLATE STANDARD OF REVIEW

Appellate courts review district court rulings on motions for judgment as a matter of law *de novo*, applying the same standard that is required of the district court. *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 153 (2d Cir. 2014). "To warrant post-verdict judgment as a matter of law, the movant must show that the evidence, when viewed most favorably to the non-movant, was insufficient to permit a reasonable juror to have found in the non-movant's favor." *Conte v. Emmons*, 895 F.3d 168, 171 (2d Cir. 2018). "The movant, generally, must be able to show a 'complete absence of evidence supporting the verdict [such] that the jury's findings could only have been the result of sheer surmise and conjecture.'" *Id.* It is incumbent upon the district court to direct a verdict when the plaintiff does not proffer the necessary expert testimony to support their claims. *Altamuro v. Cnty. of Nassau*, 33 F. App'x 556, 561 (2d Cir. 2002).

This Court "review[s] the district court's decision to deny a motion for a new trial pursuant to Fed. R. Civ. P. 59 for abuse of discretion." *Smith v. Carpenter*, 316

F.3d 178, 183 (2d Cir. 2003) (citing *New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*, 295 F.3d 232, 248 (2d Cir. 2002)).

## ARGUMENT

### I. THIS COURT SHOULD REVERSE THE DISTRICT COURT AND GRANT BMW A DIRECTED VERDICT ON THE GBL 349 CLAIM

Boateng's GBL 349 claim, as vague as it was and is, was premised on the theory that BMW omitted disclosing to him, when he purchased the Vehicle in December of 2013, and prior to his July 6, 2016 accident, that if the soft close-equipped driver's door of the Vehicle were to close on a fingertip, it could result in injury. Boateng contended at trial that other customer complaints received by BMW prior to his accident provided BMW with sufficient knowledge of the potential risk that BMW should have disclosed that potential to him.

The District Court should have granted a directed verdict in BMW's favor dismissing Boateng's GBL 349 claim, because the evidence adduced at trial established that: (i) BMW did not (and even today does not) have actual knowledge that the soft close mechanism itself poses an increased risk of injury over doors that are not equipped with the feature; (ii) there was no material omission or concealment; (iii) BMW provided warnings which were not misleading and would have been understood by any reasonable consumer acting reasonably; (iv) Boateng himself was not misled; and (v) any alleged omission was not the cause of Boateng's accident and injury. Each one of these reasons was independently sufficient to

dismiss the GBL 349 claim. Moreover, if BMW is found liable for a GBL 349 violation on this trial record, then that precedent would establish an impracticable regime for product manufacturers to satisfy.

### A. Standard for Renewed Directed Verdict Motion

The Rule 50 directed verdict standard is similar to that for a motion for summary judgment. *Cobb v. Pozzi*, 363 F.3d 89, 101 (2d Cir. 2004). The court may grant judgment as a matter of law "if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Kinneary v. City of New York*, 601 F.3d 151, 155 (2d Cir. 2010) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008)); *see also Fane v. Zimmer, Inc.*, 927 F.2d 124, 128 (2d Cir. 1991).

For example, in *Okemo Mountain, Inc. v. Sikorski*, 303 F. App'x 938 (2d Cir. 2008), the defendant-appellant ("Okemo") filed a post-jury trial Rule 50(b) motion for judgment as a matter of law to dismiss the intentional infliction of emotional distress ("IIED") claim for which it was found liable. The district court denied Okemo's motion as to the IIED claim; and the focus of the appeal was not on the jury instructions but on the district court's rulings on the motions. *Id.* at 939. This Court, upon analyzing the trial record and finding that the essential elements to the

claim were not met, reversed the district court's denial of Okemo's motion on the IIED claim, and remanded the matter to the district court to vacate the monetary award entered in the plaintiff-respondent's favor on this claim. *Id.* at 942.

## B. <u>The Trial Evidence Was Insufficient to Find GBL 349 Liability</u>

As in *Okemo*, the evidence at trial failed to provide a foundation upon which any reasonable jury could infer facts sufficient to hold BMW liable under GBL 349. To prevail on a GBL 349 claim, the plaintiff must prove that the defendant "made a misrepresentation or omission which was likely to mislead a reasonable consumer, which actually deceived [plaintiff], and which caused [plaintiff's] injury." *Levine v. Philip Morris Inc.*, No. 102765/1998, 2004 WL 2334287, at *7 (N.Y. Sup. Ct. N.Y. Cnty. 2004) (citing *Solomon v. Bell Atl. Corp.,* 9 A.D.3d 49, 52 (N.Y. App. Div. 1st Dept 2004)).

### i. *BMW's Warnings Were Not Misleading to a Reasonable Consumer Acting Reasonably, Nor Was Boateng Himself Misled*

"Courts use an objective standard for determining whether acts or practices are materially deceptive or misleading to a reasonable consumer acting under the circumstances." *Morales v. Kimberly-Clark Corp.*, No. 18-CV-7401 (NSR), 2020 WL 2766050, at *5 (S.D.N.Y. May 27, 2020) (quoting *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 8 F. Supp. 3d 467, 478 (S.D.N.Y. 2014) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995)) (internal quotation marks omitted).

"A reasonable consumer does not lack common sense." *Troncoso v. TGI Friday's Inc.*, No. 19 CIV. 2735 (KPF), 2020 WL 3051020, at *7 (S.D.N.Y. June 8, 2020) (quoting *Daniel* v. *Mondelez Int'l, Inc.*, 287 F. Supp. 3d 177, 193 (E.D.N.Y. 2018); citing *Weinstein* v. *eBay, Inc.*, 819 F. Supp. 2d 219, 228 (S.D.N.Y. 2011)); *see also Wurtzburger v. Kentucky Fried Chicken*, No. 16-CV-08186 (NSR), 2017 WL 6416296, at *3 (S.D.N.Y. Dec. 13, 2017).

It is also axiomatic that reasonable consumers are familiar with, and therefore are not misled by, "facts of life." *See, e.g.*, *Solak v. Hain Celestial Grp., Inc.*, 3:17-CV-0704 (LEK/DEP), 2018 WL 1870474, at *4 (N.D.N.Y. Apr. 17, 2018); *Manuel v. Pepsi-Cola Co.*, No. 17 Civ. 7955 (PAE), 2018 WL 2269247, at *9 (S.D.N.Y. May 17, 2018).

Here, too, reasonable consumers acting reasonably surely would understand the universally known "fact of life" that fingers and body parts need be kept clear of the path of closing doors, else one could be injured. BMW AG's head of door design, Klaus Bruecklmeier, testified that from BMW's standpoint, it is not a reasonable consumer expectation that one could shut a soft close-equipped car door on one's finger and not suffer an injury. (JA-1168 to 1169).

BMW's warnings expert, Dr. Nathan Dorris, testified that even if a consumer had not read the Owner's Manual or the particular door warning therein (as was the

case with Boateng), one could reasonably be expected to understand that there exists a risk of injury from closing a car door on one's hand. (JA-1427 to 1428).

Similarly, Boateng's own engineering expert, Dr. James Pugh, acknowledged that people must be careful around any closing door, whether it is equipped with soft close or not. (JA-663 to 664). A door is a door, essentially.

In fact, that was Boateng's understanding as well. Boateng testified that he did not need an Owner's Manual to tell him how to exit the Vehicle or how to properly close the door. (JA-337 to 338, 390 to 391). He testified that he had known, since childhood, not to put his finger or body part in the space between any closing door and its door frame. (JA-353 to 354). Boateng re-confirmed his understanding with first-hand experience, describing that more than a decade prior to the trial he had closed a house door on his hand. (JA-216, 355). Boateng observed that his car doors would automatically cinch closed about one week after purchasing the Vehicle, and inquired about this feature with his salesperson. (JA-189 to 190). Not surprisingly, given his recognition of the inherent risk of injury, Boateng testified at trial that he had no intention of closing the car door on himself on the day of his accident. (JA-191). On the other hand, the undisputed facts concerning the approaching truck, and Boateng's response to it, clearly evince an understandable concern over a larger safety issue in that moment.

On direct examination by Boateng's counsel, non-party witness Tonya Perry testified that she and her young son, Tahir, had ridden in Boateng's vehicle on at least one occasion prior to the incident, and that she was "made aware" that Boateng's vehicle had soft close automatic doors. (JA-96). She learned that the first time that she rode in the car. (JA-97). Ms. Perry further testified that they "both warned" her son. (JA-96 to 97).

Given the testimony and evidence at trial, it could not possibly be said that a reasonable consumer acting reasonably would be misled so as to believe that he or she could close a BMW soft close-equipped car door on one's finger and not suffer an injury.

The District Court nevertheless stated: "The key fact here is the amount of force required to close the door." (SPA-67 to 68). The District Court suggested that "[t]he fact that the maximum force applied by the soft-close mechanism is more than double that required to fracture a thumb," (SPA-68 to 69), is somehow unusual or abnormally dangerous.

This conclusion, however, was erroneous because it failed to acknowledge that the trial record also established that the high forces required to close a vehicle door are a consequence of having to compress the weather seals of the doors—which is an ever-present issue on all car doors, whether they are equipped with soft-close or not. (JA-1050); (JA-1296 to 1297, 1336, 1358 to 1360). These weather seals

12

harden in colder weather conditions, increasing the force required to achieve full closure, and a customer may find the door difficult to close. (JA-1058 to 1059); (JA-1261 to 1262). Notably, this is the same issue which the District Court openly expressed difficulty understanding at trial, (JA-997 to 999), and about which the District Court directly and repeatedly asked questions of BMW's expert Mr. Parker. (JA-1274 to 1276, 1288 to 1291, 1359 to 1361).

### ii. There Was No Material Omission or Concealment, Because BMW Provided Appropriate Warnings

Even were it not within the common sense of the reasonable consumer to keep one's fingers out of a closing door, the trial record establishes no material omission or concealment here, because BMW affirmatively provided a plethora of appropriate warnings to consumers, including Boateng, had he read them, about the risk of personal injury from closing doors.

In the 2013 BMW X5 Owner's Manual, BMW warned:

## Doors

### Automatic soft closing

To close the doors, push lightly. It is closed automatically.

⚠️ Danger of pinching
Make sure that the closing path of the doors is clear; otherwise, injuries may result. ◄

(JA-2228); (JA-2175). The meaning of the warning symbol was explicitly defined in the Owner's Manual as follows:

## Symbols

⚠ Indicates precautions that must be followed precisely in order to avoid the possibility of personal injury and serious damage to the vehicle.

(JA-2199). BMW's warnings expert Dr. Dorris demonstrated that this symbol of the triangle with exclamation mark is one of the safety alert symbols prescribed in the ANSI Z535 voluntary safety standard, and is appropriately used to signal a risk of personal injury. (JA-1408 to 1409); (JA-2563). Dr. Dorris testified that the word "Danger" is appropriately used, under the ANSI Z535 standard, to signal the risk of personal injury. (JA-1408 to 1409). Dr. Dorris explained that, given the context of a closing car door, consumers would reasonably be expected to understand that the potential injury could be a serious one. (JA-1411).

Dr. Dorris also testified that the words "pinching" and "pinch point" are commonly used in warnings, and when used in that context, refer to the mechanism or the movement of parts which create the risk, and not to the severity of the potential injury. (JA-1409 to 1411, 1419 to 1420, 1425). Dr. Dorris testified as to how the Consumer Product Safety Commission itself used the term "pinch" in connection with serious injuries that could be caused by the movement of a ladder coming together. (JA-1422 to 1424); *see also* (JA-1410, other examples). Notwithstanding counsel's effort at trial to ridicule and confuse what was being conveyed to the consumer by such warnings, BMW clearly was not conveying to the public that the

severity of potential injury was at most a "pinch". Were that so, presumably the company would not have used the signal word "Danger" and the ANSI safety alert symbol to draw consumers' attention to this important issue.

To this very point, in the BMW Safety Tips document, BMW warned of "serious injury or death" as possible consequences for ignoring the safety messages contained therein:

> Please read the following information carefully, and share it with all passengers. Help us to make your driving experience a safer one. **Warning:** Ignoring these safety tips could result in serious injury or death.

(JA-2540). In the section immediately following that message, BMW expressly issued a warning about car doors:

> Pay specific attention to all occupants, especially children, to avoid injury from a moving window, sunroof, convertible top, seat, door, hood or trunk lid.

(JA-2540); (JA-2175).

In the Quick Reference Guide, BMW again directed consumers to review the Owner's Manual for their own safety and the safety of others:

> For your safety and the safety of others, please read the printed Owner's Manual.

(JA-1982). Dr. Dorris testified that the Quick Reference Guide directing consumers to the warnings in the Owner's Manual is what ANSI Z535 classifies as a "supplemental directive." (JA-1405 to 1406). Dr. Dorris further testified that

Owner's Manuals are the preferred way for delivering safety messages to consumers, and that BMW's warnings complied with the ANSI standard. (JA-1433 to 1434).

On this critical issue, Boateng testified that his Vehicle in fact came with an Owner's Manual, but he did not look at it prior to his accident. (JA-336 to 337). Boateng testified at trial to having reviewed a "smaller manual," but could not recall if it was BMW's Safety Tips Document. (JA-410 to 411). Still, he conceded that could have been the document he had reviewed. (JA-411). Alternatively, if the "smaller manual" was the Quick Reference Guide, then Boateng clearly did not heed the directive contained therein: "For your safety and the safety of others, please read the printed Owner's Manual." (JA-1982).

In sum, there was no material omission or concealment, because BMW did in fact warn consumers of the risk of injury associated with the car doors. Boateng, however, by his own admission, failed to read those warnings. Since Boateng did not read the available warnings, even if there were a finding of a material omission on BMW's part, it could not have been the cause of his injuries.

The District Court, however, conjectured that "based on the trial record, the jury could have concluded that BMW's failure to disclose to Mr. Boateng that the soft-close equipped door operated with sufficient force to amputate a finger or thumb, and that the mechanism had no means of detecting such an obstruction, to be a material omission." (SPA-87). In other words, the District Court suggested that

BMW's warning did not communicate the severity of a resultant injury sufficiently. Simply stated, that is wrong. The District Court clearly ignored that BMW, in its Safety Tips document, states that the consequence of ignoring its warnings, including the warning to be mindful of closing doors, could be "serious injury or death" — and that language certainly encompasses the severity of a fingertip amputation. As such, the evidence before the jury was clear that BMW had indeed shared those risks with consumers, including Boateng.

The District Court also ignored that Boateng concededly never read the Owner's Manual. Certainly, if Boateng had read and heeded BMW's warning to be mindful of the closing door then his accident could have been prevented. But since Boateng undisputedly did not even read the warnings that BMW provided, then no warning—no matter how severe the language—could have changed the outcome for Boateng at the time of his accident.

### iii. BMW Could Not Warn of That Which It Did Not Know; There Is No Proof that Soft CloseDoors Increase the Risk of Amputations

"Where, as here, the allegations of materially misleading or deceptive conduct pertain to omissions, the defendant alone must 'possess[] [the] material information that is relevant to the consumer and fail[] to provide this information.'" *Morales*, 2020 WL 2766050, at *5 (quoting *Braynina v. TJX Companies, Inc.*, No. 15 Civ. 5897 (KPF), 2016 WL 5374134, at *4 (S.D.N.Y. Sept. 26, 2016) (quoting *Oswego*, 85 N.Y.2d at 26)). "A defendant's failure to reveal facts of which even it

was unaware will not lead to liability under G.B.L. § 349." *Morales*, 2020 WL 2766050, at *5 (citing *In re Sling Media Slingbox Advert. Litig.*, 202 F. Supp. 3d 352, 359 (S.D.N.Y. 2016)).

To the extent that Boateng's contention might be that he was not warned of the risk of amputation specifically, and that such warning would have induced him to behave differently and avoid his incident, BMW's position at trial supported by the evidence, was that it could not be accused of failing to warn of that for which there is no proof.

Although Boateng claims that other customer complaints that BMW received prior to his accident provided BMW with such knowledge—the trial record establishes that BMW did not (and, even today, does not) know that soft close doors pose a risk of amputations above and beyond the risks associated with non-soft close doors. To the contrary, door closure injuries, with or without soft close, are common.

### a. BMW's Knowledge

BMW's knowledge as of the date of Boateng's accident is memorialized in its letter to the KBA, coincidentally issued on the date of Boateng's accident, July 6, 2016. (JA-2072). In that letter, BMW AG disclosed to the German federal regulatory authority that over the fifteen (15) years since the introduction of the soft close feature in 2001, it had received 44 claims worldwide alleging finger injuries in connection with soft close activation. (JA-2073). BMW AG explained to the KBA

that the door gap dimensions of the soft close feature had been previously evaluated by the third-party German testing agency, TUV. (JA-2073); *see also* (JA-2057, memorializing TUV's finding that "when the maximum protrusion is 6 + 1 mm . . . the resulting door gap dimension offers sufficient protection"); (JA-2104, KBA forwarding the TUV July 26, 2016 email explaining what TUV considered). BMW AG further reproduced to the KBA the warning about the feature that is contained in Owner's Manuals, and explained that "anti-trap protection cannot be reliably implemented due to the short functional path in connection with the necessary forces." (JA-2073 to 2074). BMW AG further explained that, in any case, "[t]he closing process can be aborted at any time by operating the inside or outside door handle." (JA-2074).

BMW AG's head of door development, Klaus Bruecklmeier, testified at trial as to what "the necessary forces" are. (JA-1073 to 1074). Namely, the door seals which exist on all car doors, whether or not they are soft close-equipped, exert a counter-pressure which resists the closing of the door when they are compressed. (JA-1050 to 1051); *see generally* (JA-1261 to 1262, 1274, 1287, 1289 to 1292, 1358 to 1361) (Mr. Parker discussing the role and counterpressure of the rubber seals in doors, windows, and trunks). On the subject E70 BMW X5 vehicle model, the force necessary to compress the seals around the door frame to full closure is 600 Newtons at room temperature. (JA-1054 to 1058); (JA-2184). Thus, the counterforce of the

seals which must be overcome, at room temperature, is already greater than the 100 pounds, approximately 445 Newtons, of force sufficient to amputate a fingertip. (JA-1057); *see also* (JA-858, BMW's biomechanic expert Dr. Greenston's testimony). And, in colder environmental conditions, the force necessary to overcome the resistance of the seals is even higher—up to 1,000 Newtons. (JA-1059, 1074). As such, it was not feasible for the soft close system to distinguish a foreign object, such as a fingertip, from the door seals themselves or other unwanted debris in that area. (JA-1076).

BMW AG also set forth its position to the KBA that the soft close system, in July 6, 2016, represented the state-of-the-art for such a system and corresponds to comparable systems of BMW's competitors. (JA-2074). At trial, Mr. Bruecklmeier explained that BMW's position was based on regularly conducted worldwide benchmarking studies. (JA-1076 to 1078). And, it remains the case that no manufacturer has implemented a soft close door system with an anti-trap sensor. (JA-1077).

Subsequently, BMW AG responded to the KBA's follow-up inquiries, and, on January 19, 2017, explained that although the door gap at the activation point of soft close is small, the soft close feature could activate if a finger is sufficiently compressed beforehand. (JA-2090). BMW AG further indicated that, in such an occurrence, whether an injury or severe injury could occur would depend on "the

anatomy, . . . how deep the finger is inserted into the door gap and how badly it was squeezed beforehand." (JA-2090). BMW AG went on to indicate that, according to the information it had received, the potential injury is usually a fingertip fracture in the nail area — not amputations. (JA-2091).

The District Court, in its analysis, however, erroneously flipped BMW's documented explanation on its head by re-characterizing it as an admission to the KBA that a finger can be compressed to the soft close operating distance. (SPA-77, 80). BMW answered KBA's specific question as to how an amputation could occur, but the District Court entirely missed the import of BMW's explanation, which is that because the activation distance is smaller than any finger, any finger in the door gap would first have to be squeezed and compressed before the soft close feature activates. (JA-2096); (JA-1333 to 1334). As such, a customer would be forewarned. The District Court further erred in that the trial record established undisputedly that the potential for injury exists with any car door, if it is slammed with sufficient force upon a finger. (JA-663). Most importantly, the BMW-KBA communications did not, in any manner, suggest that an amputation danger from a soft close door is greater than that from a non-soft close door.

Indeed, BMW's explanation was not lost on the KBA. On September 21, 2017, the KBA concluded its inquiry into the soft close feature and indicated to BMW AG that no further measures would be taken, although it would continue to

monitor the market. (JA-2188). The KBA has not changed its position since then. (JA-1095 to 1096).

### b. The Other Complaints

Second, the other customer complaints could not have proven that soft close increases one's risk of a serious injury. Of those claims collected over the fifteen (15) year period preceding Boateng's accident, only two (2) involved alleged amputation, and the circumstances reported to BMW in those two (2) instances established that the soft close feature was not, of itself, to blame for the incident or injury.

BMW's understanding of the first alleged amputation, involving the complainant, a Mr. Conner, was that it occurred after he accidentally caught his finger in one of his car's doors, panicked, and tried to jerk it out, resulting in an injury. (JA-1008); *see also* (ECF No. 147-31, Pl.'s proposed trial exhibit 108, at p. 3 of 15) (not in evidence per the District Court's ruling on motions *in limine*, ECF No. 157, but which is the underlying record memorializing BMW's understanding). The District Court ignored Mr. Conner's claim in its Order, presumably agreeing with BMW that it is dissimilar and does not constitute any notice to BMW relevant to Boateng's claim.

BMW's understanding of the only other alleged amputation injury, involving a German woman whose claim initiated KBA's inquiry in 2016, was that she leaned

on her car door and applied pressure against it with her body, compressing her finger to the minimal space representing the door's activation distance. (JA-1115); (JA-2073). This incident, too, obviously points to causes and forces other than a reasonable consumer using the soft close door reasonably, such that it could have put BMW on notice of an increased risk of amputation. For the jury to have found otherwise on such evidence would have been impermissible.

### c. The Prevalence of Car Door Injuries, With or Without Soft Close

Third, the evidence presented at trial established that injuries from closing car doors are common, with or without any soft close feature. BMW's independent door design expert Donald Parker testified that he had reviewed the U.S. National Highway Traffic & Safety Administration's ("NHTSA") 2012 statistical study about non-crash, or not-in-traffic, injuries, and the most prevalent source of injuries was from closing car doors. (JA-1262). That publication, admitted into evidence, states:

> In fact, the most common non-crash injury scenario was an injury from a closing vehicle door on a finger, hand, or other body part, which accounted for an estimated 136,000 injuries per year or 22 percent of the non-crash injuries.

(JA-2572).

Even Boateng's hospital records corroborated that "cars" are a common cause of finger amputations. Boateng's treating physician Dr. Hoschander testified that St. Joseph Hospital's discharge instructions to Boateng were not individualized to

Boateng, but were the same instructions given to all patients who might have lost all or part of a finger. (JA-565 to 567). The discharge instructions list common causes of finger amputations, and "car" is the first item listed. (JA-567); (JA-1742).

The District Court, however, ignored BMW's above evidence about the prevalence of door closure injuries, with or without soft close.

### d. The Safety Benefits of Soft Close

Fourth, contrary to Boateng's contention that the soft close feature increases the risk of injury, the trial evidence confirmed the opposite. Indeed, BMW AG's head of door development, Brueclmeier, testified that BMW's design intent for the soft close feature was primarily safety related, and that one such intent was to increase the safety to users by eliminating the need to forcefully slam a door to achieve full closure. (JA-1053 to 1054). Brueclmeier testified that soft close doors also increase safety for occupants by ensuring full closure every time and preventing "pseudo-lock," i.e., when the door appears to be, but is not in fact, fully closed. (JA-1045, 1053).

Consistent with that design intent, BMW's design expert Parker testified that NHTSA's data, from 2012 to 2019, showed a decreasing trend in door closure injuries as a percentage of non-crash injuries, even as soft close and similar technologies of other manufacturers have proliferated. (JA-1309 to 1312). The

District Court, in its Order, ignored Mr. Parker's testimony about the NHTSA data trend of decreasing door injuries.

Boateng's engineering expert, Dr. James Pugh, agreed with BMW that a fully closed door is more protective of an inadvertent opening than a door that is merely in the outer latched position, and that there is a benefit to achieving full closure of the doors under any condition. (JA-663 to 664). Dr. Pugh further agreed that there is a potential for injury every time someone slams or forcefully closes a door, and that not having to slam or forcefully close a car door can confer a safety benefit to people who are near the doors. (JA-663). Dr. Pugh also shared the commonsense view that everyone should be careful not to have his or her fingers or other body parts in the path of a closing door, whether equipped with the soft close feature or not. (JA-664). The District Court, in its Order, ignored these concessions of Dr. Pugh.

Rather than crediting BMW's unrebutted evidence about the safety benefits of soft close, the District Court held BMW to an even higher standard, stating: "BMW did not offer any evidence to suggest that the presence of soft-close doors *actually* resulted in fewer injuries from individuals slamming their doors less often, other than Mr. Parker's testimony that 'if' less people slam their doors, less injuries are likely to happen." (SPA-76 n.7) (emphasis in original) (citing JA-1312).

To the contrary — and although it was never BMW's burden to do so — BMW put into evidence NHTSA's 2012 Not-in-Traffic Surveillance statistics; Parker's testimony about the decreasing trend in door closure injuries from 2012 to 2019, Boateng's expert Dr. Pugh's concession that there is a risk of injury any time a door is slammed; and Parker's unrebutted testimony that there has been no other significant change in door design in recent years other than the proliferation of soft close and similar technologies from other manufacturers. Taken together, the evidence indicates that the proliferation of soft close should be credited with the actual reduction in door closure injuries. Boateng offered no evidence to the contrary.

The District Court, however, nonetheless erroneously concluded "that the soft-close automatic door posed an *additional risk* of injury above and beyond that posed by a standard car door, and that the jury could find the failure to disclose that additional risk to be materially misleading." (SPA-76) (emphasis in original). To support this, the District Court cited and characterized BMW's expert Parker's testimony as follows: "As Mr. Parker explained, the additional risk from a soft-close mechanism occurs in a situation where an individual is 'not trying to close the door, but [] just brings it to a distance of 6 millimeters [from the door pillar.'" (SPA-76) (quoting JA-1332).

That, however, is an incorrect explanation of Mr. Parker's testimony. He did not testify that this makes the soft-close feature "additionally" dangerous. To the contrary, on that page, he merely tried to confirm that he understood the hypothetical scenario that counsel and the District Court were asking him about. On the following pages, he proceeded to explain why this is logically not an issue:

> Q:  Are you saying that the door -- the door is squeezing the finger or the person is squeezing his own finger?
>
> A:  He'd have to squeeze his own finger to the secondary latch position. That's the whole point.
>
> Q:  Why would somebody squeeze his own finger?
>
> A:  Exactly.
>
> . . . .
>
> THE COURT:  He is asking you whether if somebody gets out of the vehicle, has their finger or their thumb in the door where it meets -- where it would meet the pillar, and moves it to within 6 millimeters.
>
> THE WITNESS: Yes, they would -- they would --
>
> THE COURT:  The door would engage, the soft-close would engage, correct?
>
> THE WITNESS: But they would be squeezing their finger before it engaged. That's what I'm saying is, you know, they would have to be squeezing their finger down to a quarter of an inch thick before it would engage.

(JA-1333 to 1334).

27

As such, Mr. Parker clearly explained how and why soft close does not increase a user's risk of an amputation, notwithstanding its functional power to overcome the resistance to closure exerted by the door frame weather seals.

In conclusion, BMW could not be expected to warn consumers that soft close doors increase the risk of an amputation injury, because there is no evidence that that is true.

### iv. In Any Case, the Low Volume of Customer Claims Could Not Be Said to Rise to the Level of a Material Omission

It is well-established that a defendant's receipt of "complaints or lawsuits regarding its product 'does not, alone, give rise to an inference that [the d]efendant failed to disclose material information'." *Bozick v. Conagra Foods, Inc.*, No. 19-CV-4045 (LJL), 2022 WL 4561779, at *37 (S.D.N.Y. Sept. 28, 2022) (quoting *Morales v. Kimberly-Clark Corp.*, No. 18-CV-7401 (NSR), 2020 WL 2766050, at *6 (S.D.N.Y. May 27, 2020)). "Whether [a defendant manufacturer's] failure to disclose the existence of [] customer complaints . . . constitutes a material omission 'depends upon the volume and accuracy of those complaints.'" *Leonard v. Abbott Lab'ys, Inc.*, No. 10-CV-4676 ADS WDW, 2012 WL 764199, at *24 (E.D.N.Y. Mar. 5, 2012) (quoting *St. Patrick's Home for Aged and Infirm v. Laticrete Int'l, Inc.,* 264 A.D.2d 652, 655–56 (N.Y. App. Div. 1999)). "[T]he mere existence of product complaints does not in and of itself prove that the product was unsafe." *Leonard*, 2012 WL 764199, at *24.

For example, in *Bozick v. Conagra Foods, Inc.*, that plaintiff attempted to create a triable issue of fact as to her GBL 349 claim by pointing to 26 customer complaints to suggest that the defendant manufacturer of PAM cooking spray had knowledge of some product defect. The district court, however, was not persuaded. The *Bozick* court reasoned that "the number of complaints over an approximately six-year period is relatively small" and noted that "there has never been a jury verdict against Conagra (or other defendant), there has never been any admission of liability of any kind or any finding of 'defect in any cooking spray product'." 2022 WL 4561779, at *37. The *Bozick* court further noted that "review of the details of those complaints indicates that some appear to have been caused by risks that [the d]efendants disclosed to consumers." *Id.* The *Bozick* court concluded that "[b]ased on this evidence, a jury could not reasonably find for [the p]laintiff." *Id.*

Likewise, in *St. Patrick's Home for Aged & Infirm v. Laticrete Int'l, Inc.*, 264 A.D.2d 652 (N.Y. App. Div. 1999), the failure to disclose "only four complaints or claims" regarding the exterior wall paneling product at issue there, was not found to "in and of itself rise to a fraudulent failure to disclose." *Id.* at 656.

Here, as discussed above, over a 15-year period between 2001 and July 6, 2016, BMW had received 44 claims worldwide alleging a finger injury from soft close activation. Only two of those claims concerned an alleged fingertip amputation, and the circumstances in both instances indicated that factors other than

soft close more likely than not caused the injuries. As in *Bozick*, prior to this case, there had never been a verdict or finding of a defect in BMW soft close doors.

Boateng never discussed the details of the other 42 claims, because of their lack of relevance. Nevertheless, for the sake of argument, even adopting the largest number 44 here, these numbers must be considered in perspective with other statistical evidence adduced at trial. In the same time period discussed above, between 2001, when the soft close feature was first introduced, through July 2016, BMW AG sold approximately 1.4 million vehicles equipped with that feature. (JA-1059 to 1060). Over an assumed 15-year lifespan of each vehicle, BMW conservatively estimated 50,000 door opening/closing cycles, based on the expected use of two driving trips per day plus one opening/closing to retrieve an item. (JA-1060 to 1061). Simple mathematics dictates that 1.4 million vehicles times 50,000 opening/closing cycles meant that there would collectively have been or would be 70 *billion* door opening and closing cycles occurring over the lifetime of the universe of these vehicles.

Otherwise presented, over a 15-year period of 2001 to 2016, the operative fractions would be: 44 claims against 1.4 million vehicles, an astonishingly small percentage (0.00007%); or 44 claims considered against 70 billion door opening and closing cycles, an even smaller percentage (0.00000006%). By comparison, as previously discussed, according to NHTSA, in the single year of 2012 *alone*, there

were approximately 136,000 door closure injuries that were significant enough to be reported to a hospital, with no distinctions as to manufacturers, vehicle models, or door types. (JA-2573); (JA-1290).

Given this context and the evidence presented at trial, the alleged failure of BMW to disclose to Boateng two (2) alleged amputations, or at most 44 claims of some other alleged injury, considered against millions of vehicles and billions of door openings and closings, could not possibly be said to have risen to the level of a 'material' omission. Accordingly, as a matter of law, there was insufficient evidence at trial to impute knowledge to BMW that soft close doors pose an increased risk of amputations or other serious injuries.

The District Court, however, ignored the above-cited cases which teach that the mere existence of other customer complaints does not by itself constitute a material omission for purposes of GBL 349 liability. Instead, the District Court simply declared that "the trial record was sufficient for the jury to conclude that the failure to explain to Mr. Boateng that customers had previously complained of soft-close related injuries, including amputation, from the soft-close equipped door constituted a material omission." (SPA-87).

### v. Any GBL 349 Omission Did Not Cause Boateng's Injury

Boateng's GBL 349 claim also fails because the essential element of causation between any alleged misrepresentation or omission and Boateng's injury is

completely lacking in the trial record. That is, to prevail on his GBL 349 claim, Boateng had to prove by a preponderance of the evidence that he was "actually deceived" and that that is what caused his injury. *See Levine v. Philip Morris Inc.*, No. 102765/1998, 2004 WL 2334287, at *7 (N.Y. Sup. Ct. N.Y. Cnty. 2004) (citing *Solomon v. Bell Atl. Corp.,* 9 A.D.3d 49, 52 (N.Y. App. Div. 1st Dept 2004)).

Indeed, even the 'bright line rule' formulated and applied by the District Court, namely that: "[A]ll Mr. Boateng needed to show, and did show, is that because of BMW's deceptive act, he suffered an injury from a door he did not know to be dangerous," (SPA-88 to 89) (citing *Stutman v. Chem. Bank*, 731 N.E.2d 608, 612-13 (N.Y. 2000)), required a causation analysis. This is absent in the District Court's Order.

As discussed above, Boateng conceded that he had long known not to put his finger in the path of any closing door. (JA-353 to 354). He admitted to not having read BMW's Owner's Manual or the warnings therein prior to his accident. (JA-336 to 337). He testified that he did not need the Owner's Manual to tell him how to operate a door. (JA-337 to 338, 390 to 391).

It was definitively established at trial that the incident occurred in response to an oncoming truck. Boateng had just exited his Vehicle's driver seat and stepped onto the roadway, held the door by placing his thumb inside the edge of the door, saw the oncoming truck, and had to step as far back as possible to make sure no part

of the passing truck touched any part of his body. (JA-197, 200, 363 to 364). Because Boateng took that self-preserving action, the truck passed within three feet without contacting him. (JA-364). It is unfortunate, but only because he had precariously placed his thumb inside the pathway of the door, that he sustained his injury as he caused the door to close.

As BMW's warnings expert Dr. Dorris summarized these circumstances:

[] Mr. Boateng understood that the door was open, he was holding it partially open or partially closed, however you look at it. He was not intending to close it, but he says as he stepped back, as the van passed, that it closed inadvertently.

So he had a correct intention, he was not wanting to have his hand in the path as the door closed, but it was really in this response where he was focused on the van that the door closed. So more information, more warning about a danger of an injury is not going to change, you know, his understanding or his intention to act in a safe way.

(JA-1432).

Critically, the District Court never addressed—even if disclosure of other injury claims had occurred prior to Boateng's accident—how that could possibly have changed the causation analysis for Boateng. He still would have stepped backward to avoid getting hit by a truck.

Furthermore, the District Court did not address that Boateng is the one who closed his door. That is, Boateng, his thumb, and the door all necessarily had to have moved back together. If only the door moved back, then Boateng would not and could not have been injured. The door must have moved back with Boateng, because

he concededly had his hand touching the door, and his thumb wrapped around the edge, as he stepped backward. (JA-197, 200, 363 to 364). In other words, Boateng indisputably moved the door closed.

In sum, Boateng's GBL 349 claim must fail as a matter of law because causation was not proven at trial.

### vi. The Putative Discrepancy in Numbers of Claims Cannot Support the GBL 349 Claim

In the absence of any evidence of an actionable deception, Boateng's counsel attempted to create one by pointing to differences in the total number of claims contained in different trial exhibits. As a brief explanation of the three exhibits and the numbers derived from them:

The first number, "44," derived from BMW AG's July 6, 2016 letter to KBA in which BMW disclosed to KBA that it had received 44 claims worldwide alleging finger injuries in connection with soft close activation since 2001. (JA-2073).

The second number, "25," was derived from a counting of the number of claims listed in Joint Ex. 1, a stipulated collection of various discovery responses made by BMW AG to Boateng, in 2019 and supplemented in 2020, with particular scope limitations as stated within the text of the responses and the exhibit. (JA-2173 to 2174); *see* (JA-49 to 50).

The third number, "19," was derived from a counting of the number of claims listed in Joint Ex. 2, (JA-2178 to 2180), the stipulated summary of the 'other claims'

exhibits that Boateng wanted to use at trial, but which the District Court ruled, in response to BMW's omnibus motion *in limine*, (ECF Nos. 147-149), could not come into evidence, except in summary form and towards the issue of notice. (SPA-7 to 17).

BMW takes no issue with these numbers being what they are—they each represent different things. The fact that BMW's 2016 letter to the KBA referenced 44 worldwide claimants, that Joint Exhibit 1 contained 25 claimants relating to specified vehicle platforms, and that Joint Exhibit 2 summarizing Boateng's proposed trial exhibits contained 19 claimants, was completely irrelevant to any question of liability against BMW in this matter. Simple chronology dictates that discovery disclosures made to an opposing party, occurring years after Boateng's accident, can never be the deceptive act or omission vis-à-vis public consumers upon which GBL 349 liability is based.[1]

During the charging conference and oral arguments on BMW's directed verdict motion, however, Boateng's counsel made clear that he saw this issue as

---

[1] Furthermore, BMW denies that it did anything improper or deceptive during discovery. The discovery process was long and contentious, but was carefully monitored by Magistrate Judge Locke, and rulings were made when issues were raised, with which BMW complied. *See, e.g.*, (ECF Nos. 31-48, Boateng's fully briefed motion to compel and BMW's cross-motion for protective order); (ECF No. 50, Minute Entry, dated June 6, 2018); (ECF Nos. 57-61, Boateng's motion for contempt); (ECF No. 62, Minute Order, dated Oct. 31, 2018); (ECF No. 165-2, BMW Defs.' Sept. 9, 2020 letter of supplementation, at 1-2, memorializing further discovery history).

relating to BMW's ultimate liability. *See* (Ex. E, 6/24/24 Trial Tr., at 1153:12-15); (Ex. F, 6/25/24 Trial Tr., at 1403:9-25).

Boateng's opposition papers to BMW's motion in the lower court again confirmed that Boateng's basis for GBL 349 liability was predicated upon counsel's manufactured issue of the different numbers of claims ('44, 25, or 19'). Indeed, the issue was a repetitive refrain throughout the opposition. *See* (JA-2681, 2684 to 2685, 2688, 2693). On page 19 of the opposition brief, Boateng contended: "BMW's own admissions of injuries, coupled with their attempts to suppress the number of reported claims, may have been the most glaring reason the jury concluded their conduct was deceptive or materially misleading in violation of GBL 349." (JA-2693). This is precisely BMW's point.

Critically, the District Court agreed with BMW that Boateng's position on the claims numbers was a legal impossibility: "Certainly, BMW's interrogatory responses themselves could not have been a 'deceptive act' for purposes of Plaintiff's GBL § 349 claim." (SPA-109 to 110). The District Court rationalized a different purpose for which the jury could have used the claims numbers—a design defect issue, (SPA-108), which means it still provides no basis for a finding of GBL 349 liability.[2]

---

[2] The claims number issue is discussed again in Section II.B. infra, because it was used by Boateng's counsel to considerable prejudicial effect against BMW, even as it provided no legally competent evidence of a GBL 349 violation.

### C. Affirming the District Court's Ruling Would Create a New and Impracticable GBL 349 Standard for Product Manufacturers

Lastly, assuming *arguendo* that the District Court's interpretation of what GBL 349 requires is correct—i.e., that BMW violated the statute by failing to disclose 44 worldwide claims about alleged door closure injuries (or 2 worldwide amputation claims) to Boateng before his accident—that kind of standard raises the bar for GBL 349 compliance to such an absurd level that no product manufacturer could ever hope to comply. That is because manufacturers are not psychics and do not know what part of the machine, or what aspect or mechanism by which a particular future customer will claim to be injured. Manufacturers receive all kinds of claims—not just claims about soft close doors. But since manufacturers have no way to target to a particular prospective customer which claims to educate them on, they would simply have to be educated about ALL of them. The utility to prospective customers of any pre-purchase warnings would also be diminished, since they would be overwhelmed with volumes of allegations, which are not necessarily verified or verifiable. And that is also setting aside any logistical questions, such as what could even be the format for the delivery of such sweeping and voluminous information.

Given the facts of this case, ruling for Boateng would impose an obligation upon product manufacturers to disclose every customer complaint to prospective customers, or else face GBL 349 liability. GBL 349 would be transformed into an inescapable liability trap for product manufacturers. This would be an absurd and

impracticable result in the law. It would also be contrary to existing precedents in this Circuit. There already exists a well-regulated system, run in connection with the U.S. government, for the notification to consumers, and recall from the marketplace, of defective automobiles. And here, it should not be lost on the Court that the jury found there to be no design defect in the BMW soft close doors of the subject vehicle.

The District Court's denial of BMW's Rule 50 motion should be reversed, and the GBL 349 claim dismissed with prejudice.

## II. THE COURT SHOULD GRANT BMW A NEW TRIAL ON THE GBL 349 CLAIM, PURSUANT TO RULE 59

Under Rule 59(a), "[t]he court may, on motion, grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). Motions for new trials are generally granted when "the verdict is against the weight of the evidence, damages are excessive, the verdict is inconsistent, substantial errors were made in admitting or excluding evidence, or in charging the jury, or because a material issue was improperly submitted or withdrawn from a jury." *De Witt v. N.Y. State Hous. Fin. Agency*, No. 97 Civ. 4651 (SAS), 1999 WL 672560, *1 (S.D.N.Y. Aug. 26, 1999) (internal citation and quotation marks omitted).

### A. The GBL 349 Verdict Is Against the Weight of Evidence

"A decision is against the weight of the evidence if and only if the verdict is (1) seriously erroneous or (2) a miscarriage of justice." *Leacock v. Nassau Health*

38

*Care Corp.*, No. 08CV02401JMAGRB, 2018 WL 4560731, at *4 (E.D.N.Y. May 25, 2018) (quoting *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417-18 (2d Cir. 2012) (quoting *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002))). "In determining whether the jury's verdict is so 'seriously erroneous' as to justify a new trial, the trial judge is free to weigh the evidence and 'need not view it in the light most favorable to the verdict winner.'" *Leacock*, 2018 WL 4560731, at *4 (quoting *Farrior*, 277 F.3d at 634-35 (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998))).

Here, the District Court should have granted BMW's motion for a new trial on the GBL 349 claim, pursuant to Rule 59, for all the same reasons discussed in BMW's appeal of the directed verdict motion, supra § I., which are incorporated by reference herein. The District Court should have freely weighed the trial record, and after so doing, determined that the jury's verdict on the GBL 349 claim was seriously erroneous, such that a new trial was warranted.

As discussed below, the District Court abused its discretion in the process of denying BMW's Rule 59 motion — as demonstrated by the fact that it specifically came about only after the District Court went against its own pretrial evidentiary rulings which it had expressly made to avoid undue prejudice and jury confusion.

### B. BMW Was Prejudiced by Boateng's Use, Over BMW's Objections and the District Court's Pretrial Rulings, of a Discovery Dispute to Manufacture a Putative Deception Under GBL 349

"Among [Rule 59(a)'s] traditional grounds for a new trial are errors in the admission or exclusion of evidence," *Leo v. Long Island R. Co.*, 307 F.R.D. 314, 321 (S.D.N.Y. 2015) (citing *Cameron v. City of New York*, 598 F.3d 50, 61-66 (2d Cir. 2010); *Tesser v. Board of Educ. of City Sch. Dist.*, 370 F.3d 314, 318-21 (2d Cir. 2004)), provided that the movant demonstrates that the error was not harmless, i.e., that "it is likely that in some material respect the factfinder's judgment was swayed by the error." *Id.* (quoting *Tesser*, 370 F.3d at 319; citing *O & G Industs., Inc. v. National R.R. Passenger Co.*, 537 F.3d 153, 166 (2d Cir. 2008)).

Here, the jury likely was materially swayed by counsel's misleading presentation, over BMW's strenuous objections, about differences in the number of claims indicated in three different documents (each with a different genesis and scope), as a deceptive act upon consumers. Indeed, given the absence of any act or omission that could be called 'deceptive,' it must be the case that this manufactured and irrelevant issue of discrepancies between these numbers—which had nothing to do with consumer communications—was the putative 'deception' upon which the jury based its finding of liability under GBL 349.

Although pretrial rulings limited Boateng's use of other claims to the issue of notice only, at trial, counsel nonetheless improperly used the numbers to imply to

40

the jury that these numbers were inconsistent with one another, and that BMW had failed to "report"[3] claims of other customers, or changed the numbers, during the course of discovery in this litigation. Counsel did so with both Neal Guthrie, BMW NA's Vice President of Customer Service, formerly BMW MC's head of assembly line, (JA-983 to 987, 989 to 999, 1007, 1011-1012, 1020),[4] and again with Klaus Bruecklmeier, BMW AG's head of door development, (JA-1119 to 1121).

A particularly egregious example was counsel's question to Mr. Bruecklmeier: "So if – if BMW acknowledges in 2016 that there are 44 claims, and then changes it to 19 right before trial -- . . . which is the correct number?" (JA-1121). BMW did not "change" anything to 19. Nineteen is the number of claims that counsel curated for the purpose of Plaintiff's proposed trial exhibits concerning other claims, which the District Court ruled upon. Although BMW's objection was sustained, the damage was done in the eyes of the jury.

---

[3] Although the issue was discovery, Boateng's counsel's ambiguous question, "So why weren't those reported?", (JA-995), in this context, also had the effect of insinuating to the jury that BMW had failed to "report" claims to regulators or to consumers.

[4] The District Court eventually sustained an objection to Boateng's counsel's line of questioning to Mr. Guthrie about the number of claims in discovery responses, but not on the grounds that the questions were misleading or irrelevant — but rather on the grounds that "It is the jury's job to find the facts," and this was stated aloud to the jury. (JA-998 to 999). Thus, the District Court appeared to endorse to the jury that they should apply this testimony to their fact finding.

Although BMW strenuously objected to these questions as having misleading and erroneous premises, the District Court overruled the objections during the sidebar conferences, believing that Defendants were attempting to take the position that separate proof would be required as against each BMW entity, (JA-1013 to 1019), and accepting Boateng's counsel's contention that he "did not get timely discovery" and would be "disadvantage[d]" if he was not permitted to prosecute this discovery-related issue in front of the jury, (JA-1116 to 1118).

In summation, Boateng's counsel further inflamed the situation by arguing to the jury that BMW had deceived them ("they tried to confuse you with smoke and mirrors, folks"), again pointing to the different numbers from the different documents. (JA-1566 to 1567).

Federal courts nationwide routinely exclude the re-litigation of discovery disputes at trial to avoid exactly this type of prejudice and juror confusion. *See In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2015 WL 8130449, at *5 (S.D.N.Y. Dec. 3, 2015); *Van v. Language Line Servs., Inc.*, No. 14-CV-03791- LHK, 2016 WL 3566980, at *4 (N.D. Cal. June 30, 2016); *Mformation Techs., Inc. v. Research in Motion Ltd.*, No. C 08-04990 JW, 2012 WL 2339762, at *2 (N.D. Cal. June 7, 2012); *Empire Gas Corp. v. Am. Bakeries Co.*, 646 F. Supp. 269, 276 (N.D. Ill. 1986).

Indeed, in allowing this drama to play out in front of the jury, the District Court went against its own ruling on the issue just prior to the start of trial. In the parties' May 9, 2024 joint letter on remaining evidentiary issues prior to trial, BMW specifically raised the concern that Boateng's counsel intended to use certain interrogatory responses to suggest to the jury that 'BMW is hiding information' among other things. (ECF No. 165, 5/9/24 joint letter re: remaining issues, at 1-2). The District Court issued its ruling on the remaining issues on May 20, 2024, and stated that:

> the Court finds that entry of the excerpted interrogatory responses by Plaintiff would, to the extent the responses are relevant, confuse the issues and create undue delay. The Parties shall not relitigate at trial a discovery dispute that should have been resolved during discovery.

(JA-49). Attempting to avoid this harm, the District Court ordered that certain information from the interrogatory responses should be put into stipulated form, consistent with its other evidentiary rulings that the other claims could be used on the issue of notice only. *Id.* Boateng's counsel, however, used the resulting stipulations for the very purpose that the District Court found would "confuse the issues." (JA-49); *see also* (JA-1013, BMW's side-bar objection).

It appears that Boateng's repeated messaging about the numbers 44, 25, and 19, as being deceptive succeeded in swaying and confusing the jury by causing them to think that some kind of deception had occurred. That the jury credited the 'claims number discrepancy' issue as the basis for GBL 349 liability is confirmed by its

finding of non-liability against BMW on the failure to warn claim. In the verdict sheet, the jury found that Boateng *did not* "prove by a preponderance of the evidence that BMW's failure to provide adequate warnings was a substantial factor in causing plaintiff's injury." (JA-2662). Presuming that the jury was consistent in its treatment of any failure to warn theory within the GBL 349 framework—then, by process of elimination, the only other argument left for the jury to credit as a 'deception' was the 'claims number discrepancy' argument.

The trial of this matter was incurably tainted by Boateng's improper, contrived presentation about putative discovery discrepancies. As a matter of law, it would be impermissible for a jury to predicate ultimate liability under GBL 349 over a dispute about content of discovery exchanged between the parties during litigation. On this issue alone, a new trial is warranted.

## III. THE COURT SHOULD GRANT BMW'S REQUEST FOR REMITTITUR OR A NEW DAMAGES TRIAL

### A. The Damages Awarded by the Jury Are Excessive and Warrant Remittitur or a New Trial on Damages

"Under [Federal Rule of Civil Procedure] 59(a) the court may overturn an excessive award and either unconditionally order a new trial or condition a new trial on the plaintiff's refusal to accept a reduction, or remittitur, in the award." *Leo v. Long Island R. Co.*, 307 F.R.D. 314, 321 (S.D.N.Y. 2015) (citing *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 433, (1996); *Turley v. ISG Lackawanna, Inc.*,

774 F.3d 140, 167-68 (2d Cir. 2014); *Rangolan v. Cnty. of Nassau*, 370 F.3d 239, 243-44 (2d Cir. 2004)). When courts "review[] the amount of damages awarded on a state law claim, [they] must apply [state] law." *Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006) (citing *Gasperini*, 518 U.S. at 430-31). "Remittitur may [] be warranted when defendants can demonstrate 'that the jury awarded specific amounts of damages that were not supported by the record.'" *Torres v. Metro-N. R.R. Co.*, No. 20-CV-10782 (LJL), 2023 WL 4487726, at *12 (S.D.N.Y. July 12, 2023) (quoting *Qiyuan Shi v. Gyamera*, 401 F. Supp. 3d 452, 464 (S.D.N.Y. 2018) (quoting *Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274, 287 (S.D.N.Y. 2008))) (internal quotation marks omitted).

### i. *The Past Lost Wages Award Lacks Support in the Trial Record*

"Under New York law, the plaintiff has the burden of establishing damages for lost wages with 'reasonable certainty, such as by submitting tax returns or other relevant documentation.'" *Wang v. Yum! Brands, Inc.*, No. 05-CIV-1783JFBMDG, 2007 WL 1521496, at *5 (E.D.N.Y. May 22, 2007) (quoting *O'Connor v. Rosenblatt*, 714 N.Y.S.2d 327, 327–28 (N.Y. App. Div. 2000)) (citing *Kramer v. Showa Denko K.K.*, 929 F.Supp. 733, 743 (S.D.N.Y.1996); *Clanton v. Agoglitta*, 615 N.Y.S.2d 68, 69 (N.Y. App. Div.1994); *Poturniak v. Rupcic*, 648 N.Y.S.2d 668, 669 (N.Y. App. Div. 1996); *Beh v. Jim Willis & Sons Builders, Inc.*, 814 N.Y.S.2d 476, 477 (N.Y.

App. Div. 2006); *Papa v. City of New York*, 598 N.Y.S.2d 558, 562 (N.Y. App. Div. 1993)).

Moreover, it is well established that "the plaintiff's uncorroborated testimony as to the amount of lost past or future wages cannot, as a matter of law, satisfy the 'reasonable certainty' standard." *Wang*, 2007 WL 1521496, at *5 (citing *Lodato v. Greyhawk N. Am., LLC*, 2007 N.Y. Slip Op. 02901, at *2–*3 (N.Y. App. Div. Apr. 3, 2007); *Del Valle v. White Castle Sys., Inc.*, 715 N.Y. S.2d 57 (N.Y. App. Div. 2000); *Nelson v. 1683 Unico, Inc.*, 668 N.Y.S.2d 375, 376 (N.Y. App. Div. 1998); *Razzaque v. Krakow Taxi, Inc.*, 656 N.Y.S.2d 208, 210 (N.Y. App. Div. 1997)).

The jury in this matter awarded $255,360 for past lost wages based on Boateng's counsel's calculation as follows: $114 per hour, multiplied by 40 hours per work week, multiplied by 56 weeks. (JA-302 to 303); (JA-1577, 1659). In other words, the requested and awarded figure for past lost wages is premised on 13 months of missed work, at his former employer's highest rate of compensation. Except for Boateng's work schedule being 40 hours per week, however, each of the numbers in this calculation is clearly belied by the trial record. *See, e.g.*, *Torres*, 2023 WL 4487726, at *8 (remitting award for lost wages that was contradicted by the trial evidence).

First, it would be incorrect to state that Boateng missed 56 weeks (13 months) of work. Rather, as he candidly conceded, the work that his company GAB

Consulting Inc. ("GAB") had contracted with Stango & Associates ("Stango") to do, and that he was unable to perform, would have taken place between July 6, 2016 and December 28, 2016. (JA-416). That is a period of just under 6 months. As Boateng explained, GAB's contract with general contractor Stango was only up to and until December 28, 2016, "because that's when the main contract was supposed to end," at which time, subcontractor GAB would "then have to negotiate with the next contractor who gains that contract from the Government." (JA-375, 415); (JA-1965).

Indeed, that is what Boateng did with SMS Data Products Group, Inc. ("SMS"), Stango's successor to the general contract with the Department of Defense. (JA-375); (JA-2119, GAB invoice to SMS). The first time that Boateng received a call from SMS soliciting GAB for a new contract was in late April 2017. (JA-163, 376). Boateng believed that "SMS had just been awarded a contract by the US Army." (JA-295). GAB signed its subcontract with SMS by May 3, 2017, and Boateng returned to work by May 22, 2017. (JA-163, 295, 376). As evidenced by GAB's invoice to SMS, (JA-2119), Boateng had clearly returned to fulltime work by mid-June, billing 85 hours of work between June 16th to June 30th of 2017. (JA-301 to 302, 374 to 376).

Second, it is speculative to say that there would have been no gap in GAB's employment between December 28, 2016 and May 3, 2017, particularly given the fact that the Department of Defense changed its contractor from Stango to SMS in

that time frame. The only evidence on when this change in general contractors occurred was Boateng's testimony that he believed "SMS had just been awarded a contract by the US Army," (JA-295), when they reached out to him in late April of 2017. Boateng also testified that in relation to SMS's employment of his company GAB, "[SMS] wanted me to be there for the beginning of that particular project," as the explanation for why he "went in to work briefly on May 22" of 2017. *See* (JA-2712) (quoting JA-295 to 296). This undercuts Boateng's contention that, but for the accident, there would have been no gap in GAB's employment between its contracts with Stango and SMS. Indeed, the trial evidence was that Stango's contract ended at the end of December 2016, and SMS's contract began circa May of 2017.

But even if GAB would have experienced no gap in the contract after December 28, 2016, Boateng indisputably returned to work in May of 2017 and was billing full time hours in June of 2017. *See* supra. That means that Plaintiff may have missed 10 months of work at most, not 13 months.

Third, even if Boateng had continued to work until December 28, 2016, given the conclusion of GAB's contract with Stango, there was no guarantee that his rate of compensation would have remained a constant $114 per hour when GAB negotiated a new contract with Stango's successor. Boateng conceded that, as an independent contractor, GAB must negotiate the terms for its contract with each new employer, and that the terms of compensation vary depending on the employer and

the contract. (JA-338 to 339). While GAB's terms of payment with SMS started at $110 per hour, which is lower than his final rate of payment from Stango, there is no evidence indicating that the lower rate was *due* to his accident. To the contrary, as Boateng explained in response to the District Court's direct questioning:

> THE COURT: May I ask, when you went back to work with this new company, SMS, were you being paid at the same rate?
>
> THE WITNESS: I was being paid a lower rate, actually. I think they were paying me 110.
>
> THE COURT: That was when you went back in after the June 2017 surgery?
>
> THE WITNESS: When I went back, that contract with SMS was, I think, for 110. And this *(sic)* things happen because once you switch to a new contractor, you will have to renegotiate through them. That's the nature of it and you can't – it doesn't always go back to the same amount and your contract may be more than what you had so that's the nature of the work.

(JA-166 to 167). Furthermore, SMS's $110 per hour rate of compensation started at a level that is higher than Stango's first two tiers of compensation, which started at $105 per hour and increased incrementally in 1-year intervals. *Compare* (JA-1965).

Fourth, Plaintiff's requested and received past lost wages award of $255,360 assumes that Boateng would have taken home 100% of the gross receipts GAB. This is plainly incorrect. Boateng conceded that GAB is not the plaintiff in this lawsuit, and conceded upon cross-examination that his take-home pay was not the same as GAB's gross receipts. (JA-331). Rather, his individual take-home pay was

49

dependent upon other factors, including but not limited to GAB's business expenses which must be deducted from Boateng's personal income. (JA-331). The District Court did not address these concessions, other than to deem GAB a "pass-through entity," which was not Boateng's testimony, (SPA-112) (citing JA-154 to 155), and which does not negate Boateng's concession or his tax returns showing that his individual take-home pay was not the same as GAB's gross receipts.

Fifth, although it is impossible to say exactly how much GAB would have grossed, or what business expenses it would have incurred had Boateng never been injured, a more accurate estimate of Boateng's lost wages, would be between $102,385 and $105,489.50, according to the documentary evidence. In 2015, the full year of work immediately *prior* to his accident, GAB's gross receipts were $228,594, (JA-1897, line 1a), but, net of GAB's business expenses, Boateng, as an individual, earned $210,979, (JA-1907, line 31). And, in 2018, the first full year of work *after* the accident, GAB's gross receipts were $231,520, (JA-1947, line 1a), but, net of GAB's business expenses, Boateng, as an individual, earned $204,770, (JA-1959, line 31).

Therefore, a full year's business income to Boateng fell within the fairly consistent range of $204,770 and $210,979. But since the only non-speculative period of missed work is the 6-month period between July 6, 2016 and December 28, 2016, a more accurate estimate of his lost wages claim would be the above

50

numbers halved, i.e., between $102,385 and $105,489.50. And, even if the Court credits Boateng for the entirety of the period between July 6, 2016 and May 22, 2017 as lost earnings, that is still only 10 months of missed work, corresponding to a range of $170,641.66 to $175,815.83.

### ii. *The Past and Future Pain and Suffering Awards Are Excessive*

"Although prior damage awards in cases involving similar injuries are not binding upon the courts, they guide and enlighten them with respect to determining whether a verdict in a given case constitutes reasonable compensation." *Davis v. State of N.Y.*, 148 A.D.3d 985, 986 (N.Y. App. Div. 2017) (quoting *Miller v. Weisel*, 15 A.D.3d 458, 459 (N.Y. App. Div. 2005)) (citing CPLR 5501(c); *Taveras v. Vega*, 119 A.D.3d 853, 854 (N.Y. App. Div. 2014)).

Here, the jury's award of $1.65 million in pain and suffering—$800,000 for past pain and suffering and $850,000 for future pain and suffering over 7 years, (JA-2667)—clearly exceeds the range of pain and suffering awarded under similar, or even more severe, circumstances, and a new trial on damages should be ordered or the damages remitted.

In *Gonzalez v. Delta International Machinery*, No. 33704/98, JVR No. 385889, 2001 WL 1136768 (N.Y. Sup. Ct. Mar. 1, 2001), a 29-year-old male carpenter allegedly suffered finger nerve damage and an amputation of his thumb tip, which required surgical repair of the thumb and two surgical procedures to repair

his index finger, when he was injured while working with an industrial saw. The plaintiff received a verdict in his favor and was awarded $142,000 for pain and suffering. *Id.* Plaintiff Gonzalez's injury was more severe than Boateng's since, not only was his thumb tip amputated, but he also required surgical repairs to his index finger. It is appreciated that this is a 2001 case, however, even considering inflation, in present day dollars, this amount would only be worth $253,194. *See* U.S. Bureau of Labor Statistics, U.S. Dep't of Labor, "CPI Inflation Calculation", https://data.bls.gov/cgi-bin/cpicalc.pl?cost1=142000&year1=200103&year2=202406 (last accessed Feb. 17, 2025).

In *Robinson v. N.Y.C. Dep't of Educ.*, 94 A.D.3d 428 (N.Y. App. Div. 2012) the student-plaintiff, who was 14 years old at the time of his accident, claimed that he had lost the tip of the middle finger on his dominant hand after catching it "on a V-shaped pinch point" located near a basketball backboard. *Id.* at 429. Plaintiff claimed that his injury resulted in sensitivity and a 25% disability of the hand. *Id.* at 429. The jury "awarded plaintiff a total of $1,003,649, including $268,000 for past pain and suffering and $600,000 for future pain and suffering for 40 years." *Id.* at 428-29. The Appellate Division, First Department, however, ordered a new trial unless the plaintiff agreed to the remitted amounts of $125,000 for past pain and suffering to and $175,000 for future pain and suffering. *Id.* at 429. By contrast,

Boateng presented no evidence at trial of any percentage of disability in his right hand. Indeed, Boateng's application for disability benefits with New York State was denied. (JA-263).

*O'Shea v. State*, No. 101626, 2007 WL 494635 (N.Y. Ct. Claims Jan. 22, 2007), involved a plaintiff in a table saw accident who had severed the third and fourth fingers of his left hand (the long and ring fingers) at the level of the proximal interphalangeal (PIP, or second) joint. *Id.* at *1, 3. The New York Court of Claims, in the role of the fact finder, noted the plaintiff's difficulties with working and activities of daily living, and awarded past pain and suffering of $150,000 and 19 years of future pain and suffering of $300,000. *Id.* at *7-8. By contrast, Boateng severed only a portion of his distal thumb tip, preserving his nailbed and first joint (the distal interphalangeal, or DIP) joint and has returned to working full-time. (JA-509 to 510).

In *Hudson v. Lansingburgh Cent. School Dist.*, 27 A.D.3d 1027 (N.Y. App. Div. 2006), the Appellate Division, Third Department, upheld the jury's award of $90,000 for past pain and suffering and $150,000 for future pain and suffering, where the 8th grade plaintiff amputated the middle finger on his nondominant hand at the level of the proximal interphalangeal (PIP or second) joint, while operating a jointer-planer machine at defendant's middle school. *Id.* at 1028, 1031.

In *Villalba v. Rockford Sys., Inc.*, No. 02-CV-4455(ARR)(RML), 2006 WL 526660, at *4 (E.D.N.Y. Mar. 3, 2006), a case in which the plaintiff amputated "the top portions of the index and middle fingers of his left, dominant hand" while working on a machine, 2006 WL 526660, at *2, the district court conducted an inquest into damages after a default judgment was entered against the remaining defendant. Plaintiff Villalba's severity of injury was similar to, or greater than, Boateng's, having lost, not one but, two fingertips (index and middle) on his dominant hand. The district court noted that:

> [Villalba] testified that he has suffered from constant pain since the accident and is unable to engage in any meaningful occupation or physical recreation. His hand is permanently deformed, and he suffers from feelings of anxiety, depression and shame as a result of the accident. At the same time, he is otherwise healthy and relatively young and retains the full use of his non-dominant hand.

2006 WL 526660, at *5. In determining what would be a reasonable award for pain and suffering, the district court reviewed other cases with injuries of similar or greater severity than the plaintiff. *Villalba*, 2006 WL 526660, at *4 (citing cases). Upon considering all these factors, the district court awarded to Villalba $50,000 for past pain and suffering and $50,000 of future pain and suffering. *See id.* at *1, 5.

Here, Boateng is a software engineer, and typing is the skill that is most important to his ability to perform his profession. (JA-167, 372 to 373). Prior to his accident, his right thumb was used to press the spacebar, and only the spacebar, when typing. (JA-168, 373). After the accident, Boateng changed his method of typing by

54

pressing the spacebar with his left thumb or right index finger. (JA-168, 373). He made that adjustment "immediately" after his accident. (JA-373 to 374).

He treated with his pain management specialist Dr. Rauchwerger between December 2016 and April 2017. His pain steadily decreased over the course of his treatment with Dr. Rauchwerger. (JA-818). From the time Dr. Rauchwerger first saw Boateng in December 2016 up until the last time he saw him in April 2017, at no time did Boateng exhibit any loss of strength or range of motion in his hand. (JA-818 to 819). Dr. Rauchwerger noted that Boateng was happy with the results each time he was treated and his level of pain decreased. (JA-819). Boateng did well following each procedure administered by Dr. Rauchwerger and had no complications. (JA-821 to 822).

Neither of Boateng's medical experts offered an opinion about how they would rate his percentage of disability. The District Court was silent as to this issue, presumably agreeing with BMW's position.

Since one year after his accident, Boateng's pain has been intermittent and of a level that he can ignore. (JA-285 to 286, 371). And since that time, he has managed his pain by taking over-the-counter medication, ibuprofen, as needed, approximately once or twice a week. (JA-383 to 384).

Boateng returned to work in early May 2017, accepting the first offer that he received in late April 2017 from SMS, the company that was awarded the general

contract with the government client after Stango's contract had expired. (JA-163, 374 to 376).

Importantly, as the District Court and jury saw firsthand, the appearance of Boateng's thumb is not entirely disfigured—rather the right thumb tip is now slightly shorter, he still has his thumb nail, and the first (DIP) joint is intact. At trial, Boateng had no issue walking up to the jury and showing his thumb to them up close. (JA-288 to 289).

In opposition to BMW's application for remittitur, Boateng cited to the awards in four (4) other cases, three (3) of them outside of New York. (JA-2709). Even if they were all New York cases, none of them are apposite, as they each involve injuries which were more severe than Boateng's thumb-tip amputation.

- *Douglas v. Knott*, JVR No. 191410, 1996 WL 777631 (Cal. Sup. Ct. 1993), involved a "partial amputation of the thumb and crushing and degloving injuries of the left, dominant hand, requiring eight surgeries and future surgery, and resulting in permanent pain, limited motion, and disfigurement; and post-traumatic stress disorder" when after being broadsided by another vehicle, "plaintiff's vehicle rolled on its side and his hand became lodged between his vehicle and the roadway."

- *Class v. Steering Wheel Rentals, Inc.*, JVR No. 378343, 2000 WL 1515708 (N.Y. Sup. Ct. 1995), involved a much younger 13-year-old plaintiff who

suffered a "finger amputation," as opposed to merely the finger *tip*, when the cargo door of a rental truck "slammed shut on his hand."

- *Carro v. Defendant*, JVR No. 133318, 1994 WL 479743 (N.J. Sup. Ct. 1991), involved an already psychiatrically disabled plaintiff who "suffered the traumatic amputation of one-third to one-half inch of the middle finger of his dominant hand . . . and contusions of the adjacent finger. The plaintiff claimed a 20 percent limited motion and increased psychiatric disorder . . . ." Moreover, despite this injury having been more severe, both physically and psychiatrically, than Boateng's, the *Carro* case settled for $459,500 in 1994 (not 1991).

- *Johnson pro ami Medvitz v. Dillard's Inc.*, JVR No. 440683, 2005 WL 6741960 (Fla. Cir. Ct. 2003), involved "a crushed dominant right hand that resulted in multiple finger amputations, partial hand amputation, hand disfigurement and emotional distress when her hand became caught in a gap between a step and the comb plate on an escalator of the defendant retail store where she was a customer."

The District Court, however, credited Boateng's cited cases over BMW's, characterizing BMW's cases as all involving "sharp" injuries, while characterizing Boateng's cases as all involving "crush" injuries, and likening Boateng's injury to a "crush" injury rather than a "sharp" injury. (SPA-121). But Boateng's injury was,

in fact, much more like the amputations described in BMW's cases than the prolonged and excruciating scenarios described, for example, in *Douglas*, where that plaintiff's hand became trapped between an overturned car and the roadway. Indeed, Boateng testified that his amputation occurred immediately, and he spent no time struggling to free his thumb from the door. (JA-364). Therefore, there was no period of time where he was experiencing his thumb tip being crushed.

In light of pain and suffering awards in cases involving similar or more severe amputations, BMW respectfully submits that the jury's award of $1.65 million for pain and suffering clearly exceeds the range of reasonable pain and suffering awards in comparable cases and should be remitted.

## CONCLUSION

For the reasons set forth herein, BMW respectfully requests that this Court reverse the Memorandum & Order of the District Court insofar as granting BMW's motion for a directed verdict on the GBL 349 claim, a new trial on the GBL 349 claim, remittitur of plaintiff-respondent's excessive award, or a new damages trial.

Dated: New York, New York
February 21, 2025

BIEDERMANN HOENIG SEMPREVIVO,
A Professional Corporation

By: _____ */s/ Joseph Kim*_____
Joseph Kim

One Grand Central Place
60 East 42nd Street, 36th Floor

New York, New York 10165
Tel: (646) 218-7647
Joseph.Kim@lawbhs.com
*Attorneys for Defendants-Appellants*
*Bayerische Motoren Werke AG,*
*BMW of North America, LLC, and*
*BMW Manufacturing Co, LLC*

To:    *All Counsel of Record (via ECF)*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

**Certification of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements**

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains <u>13,976</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated:     New York, New York
            February 21, 2025


            _____*/s/ Joseph Kim*_____
                 Joseph Kim

            BIEDERMANN HOENIG SEMPREVIVO
            One Grand Central Place
            60 East 42nd Street, 36th Floor
            New York, New York 10165
            Tel: (646) 218-7647
            Joseph.Kim@lawbhs.com
            *Attorneys for Defendants-Appellants*
            *Bayerische Motoren Werke AG,*
            *BMW of North America, LLC, and*
            *BMW Manufacturing Co, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, Joseph Kim, attorney for the defendants-appellants Bayerische Motoren Werke AG, BMW of North America, LLC, and BMW Manufacturing Co., LLC, hereby certify that on the 21st day of February, 2025, a true copy of the foregoing Appellant's Brief will be filed through the ACMS system and sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be served via first-class mail, postage prepaid, upon anyone indicated as a non-registered participant.

Dated:      New York, New York
              February 21, 2025


                         */s/ Joseph Kim*
                         Joseph Kim

                      BIEDERMANN HOENIG SEMPREVIVO
                      One Grand Central Place
                      60 East 42nd Street, 36th Floor
                      New York, New York 10165
                      Tel: (646) 218-7647
                      Joseph.Kim@lawbhs.com
                      *Attorneys for Defendants-Appellants*
                      *Bayerische Motoren Werke AG,*
                      *BMW of North America, LLC, and*
                      *BMW Manufacturing Co, LLC*