# 24-2976

# United States Court of Appeals for the Second Circuit

GODWIN BOATENG,

*Plaintiff-Appellee,*

v.

BMW OF NORTH AMERICA, LLC, BMW MANUFACTURING CO., LLC and BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, a German Corporation,

*Defendants-Appellants,*

BMW OF NORTH AMERICA, INC., BMW (US) HOLDING CORPORATION, BMW GROUP and KIEKERT AG,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLEE

A. COHEN LAW FIRM, P.C.
*Attorneys for Plaintiff-Appellee*
11 Sunrise Plaza, Suite 304
Valley Stream, New York 11580
(516) 341-7770
avi@acohenlawfirm.com

3256



ELECTRONIC
PARALEGAL

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... iii

JURISDICTIONAL STATEMENT ....................................................... 1

COUNTER-STATEMENT OF THE ISSUES ....................................... 1

SUMMARY OF THE ARGUMENT .................................................... 5

ARGUMENT ....................................................................................... 7

  I.   THE DISTRICT COURT SHOULD BE AFFIRMED, AS BOATENG
    PROVED AT TRIAL THAT BMW VIOLATED GBL § 349 BY A
    PREPONDERENCE OF THE EVIDENCE ....................................... 7

   A.  The Appellants' Post-Trial Motion Under Rule 50 and Rule 59 was
    Untimely. ................................................................................... 7

   B.  Legal Standard for Directed Verdict Motion. ............................... 8

   C.  The Elements of a GBL 349 Violation. ...................................... 10

   D.  BMW Failed to Object to the Jury Instructions or Verdict Sheet at the
    Charging Conference ................................................................ 13

   E.  Boateng Demonstrated Evidence of Appellants' GBL 349 Violation ....... 14

      1.  Boateng Established BMW's Conduct was "Materially Misleading"
       under GBL 349 at Trial ....................................................... 15

      2.  The Evidence Adduced at Trial Makes Clear that BMW Possessed
       Crucial Information and Knowledge concerning the Dangers of SCAD,
       which it otherwise Suppressed and Concealed ......................... 19

      3.  Having Proved BMW's Materially Misleading Conduct, Boateng
       Successfully Proved he was Injured ...................................... 29

  II.   BMW'S MOTION FOR A NEW TRIAL PURSUANT TO FRCP 59
    WAS PROPERLY DENIED ......................................................... 31

   A.  Legal Standard ........................................................................ 34

   B.  Boateng Demonstrated Sufficient Evidence to Support the Jury's Verdict
    36

   C.  BMW Was Not Prejudiced by Boateng's Use of Evidence Which BMW
    Produced in Discovery, and Did Not Object to its Admission in Evidence ..... 38

   D.  The Damages Awarded By the Jury Was Not Excessive, and a Remittitur
    or New Trial on Damages is Not Warranted ............................... 42

**1.    The Jury Award as to Lost Wages, as Affirmed by the District Court, was Correct and is Supported by the Trial Record.** ....................42

**2.    The Past and Future Pain and Suffering Award, as Affirmed by the District Court, was not Excessive.**...............................................47

**CONCLUSION**......................................................................................54

# TABLE OF AUTHORITIES

## CASES

*Anunziatta v. Orkin Exterminating Co., Inc.*, 180 F. Supp. 2d 353 (N.D.N.Y. 2001) ................................................................................................................37

*Attridge v. Cencorp Div. of Dover Tech. Intern., Inc.,* 836 F.2d 113 (2d Cir. 1987) ................................................................................................................42

*Barkley v. United Homes, LLC*, 2012 U.S. Dist. LEXIS 85793 (E.D.N.Y. June 20, 2012, No. 04-cv-875)..................................................................................8

*Barnes v. Alves*, 304 F.R.D. 363 (W.D.N.Y. 2015)..................................................39

*Bodine v. Brunelle*, 1999 U.S. Dist. LEXIS 21529 (W.D.N.Y. May 14, 1999, 97-CV-57S(F) ..............................................................................................42

*Bozick v. Conagra Foods, Inc.*, 2022 U.S. Dist. LEXIS 176919 (S.D.N.Y. Sep. 28, 2022, No. 19-cv-4045)..........................................................................28

*Broadnax v. City of New Haven*, 415 F.3d 265 (2d Cir. 2005) ...............................8

*Chnapkova v. Koh*, 1992 U.S. Dist. LEXIS 5878 (S.D.N.Y. Apr. 28, 1992, 88 Civ. 6144 (CMM)...........................................................................................48

*Class v. Steering Wheel Rentals, Inc.*, JVR No. 378343, 2000 WL 1515708 (N.Y. Sup. Ct. 1995)........................................................................................49

*Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111 (2d Cir. 2007) .................... 11, 29

*Dagnello v. Long Island R.R.*, 289 F.2d 797 (2d Cir. 1961) ...................................53

*Feldman Law Group P.C. v. Liberty Mut. Ins. Co.*, 819 F. Supp. 2d 247 (S.D.N.Y. 2011) ............................................................................................34

*Fibermark, Inc. v. Brownville Specialty Paper Prods.*, 419 F. Supp. 2d 225 (N.D.N.Y. 2005) ...........................................................................................29

*Hertz Global Holdings, Inc. v. Natl. Union Fire Ins. Co.*, 2022 U.S. Dist. LEXIS 54393 (S.D.N.Y. Mar. 25, 2022, No. 19-cv-6957 (AJN)....................................34

*ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92 (2d Cir. 2014) ........................................................................................................... 33, 36

*Jackson-Mau v. Walgreen Co.*, 652 F. Supp. 3d 349 (E.D.N.Y. 2023) .................31

*Johnson v. Perry*, 763 F. App'x 81 (2d Cir. 2019)..................................................36

*Jones v. Treubig*, 963 F.3d 214 (2d Cir. 2020)........................................................9

*Kappen v. Bell*, 2022 U.S. Dist. LEXIS 57225 (E.D.N.Y. Mar. 28, 2022, No. 18-ev-05784(CBA) .............................................................................................41

*Kinneary v. City of New York*, 601 F.3d 151 (2d Cir. 2010) ...................................12

*Kirschner v. Off. of Comptroller*, 973 F.2d 88 (2d Cir. 1992) ...............................40

*Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 967 N.E.2d 675, 944 N.Y.S.2d 452 (2012).......................................................................................11

*Koch v. Greenberg*, 626 F. App'x 335 (2d Cir. 2015)................................... 10, 23

*Lambert v. Genesee Hosp.*, 10 F.3d 46 (2d Cir. 1993) ...........................................8

*Legg v. Ulster County*, 979 F.3d 101 (2d Cir. 2020) ..............................................8

*Leonard v. Abbott Labs., Inc.*, 2012 U.S. Dist. LEXIS 30608 (E.D.N.Y Mar. 5, 2012)........................................................................................................27

*Lexington Furniture Indus. V. Lexington Co.*, 2023 U.S. App. LEXIS 34154 [2d Cir. Dec. 26, 2023, No. 22-2993) ...................................................................9

*Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. 2012)........................................53

*MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89 (2d Cir. 2023)......11

*Manley v. AmBase Corp.*, 337 F.3d 237 (2d Cir. 2003) .......................................35

*Mantikas v. Kellogg Co.*, 910 F.3d 633 (2d Cir. 2018) ........................................20

*Marcic v. Reinauer Transp. Companies*, 397 F.3d 120 (2d Cir. 2005)..................36

*Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120 (2d Cir. 2005)............................36

*Martell v. Boardwalk Enters.*, 748 F.2d 740 (2d Cir. 1984)..................................53

*McKeon v. Sears, Roebuck & Co.*, 690 N.Y.S.2d 566 (1st Dep't 1999) ................50

*Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*, 290 F.3d 98 (2d Cir. 2002)........35

*Meide Zhang v. Liang Zhang*, 2019 U.S. Dist. LEXIS 24372 (S.D.N.Y. Feb. 14, 2019)........................................................................................................40

*Nick's Garage, Inc. v. State Farm Gen. Ins. Co.*, 2013 U.S. Dist. LEXIS 26654 (N.D.N.Y. Feb. 27, 2013, No. 5:12-cv-633) ................................................31

*Noonan v. Midland Capital Corp.*, 453 F.2d 459 (2d Cir. 1972) .............................9

*Okemo Mountain, Inc. v. Sikorski*, 2006 WL 335858, No. 1:93-CV-22 (D. Vt. Nov. 16, 2006)........................................................................................................14

*Okemo Mountain, Inc. v. Sikorski*, 303 F. App'x 938 (2d Cir. 2008) ....................14

*Paradowski v. Champion Petfoods USA, Inc.*, 2023 U.S. App. LEXIS 13982 (2d Cir. June 6, 2023, No. 22-962-cv) ............................................................ 11, 20

*Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1 (2d Cir. 1996) ...................36

*Raedle v. Credit Agricole Indosuez*, 670 F.3d 411 (2d Cir. 2012) ........................35

*Ramos v. City of New York*, 891 N.Y.S.2d 385 (1st Dep't 2009)...........................50

*Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256 (2d Cir. 1995)................29

*Sequa Corp. v. Gbj Corp.*, 156 F.3d 136 (2d Cir. 1998) .......................................36

*Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43 (1999).........................................11

*Smart v. United States Lab. for Hire, Inc.*, 2024 U.S. Dist. LEXIS 119658 (E.D.N.Y. June 26, 2024, No. 20-CV-5594 (TAM) ......................................35

*Sorenson v. Wolfson*, 2015 U.S. Dist. LEXIS 88401 (S.D.N.Y. July 7, 2015) ....... 42

*St. Patrick's Home for the Aged & Infirm v. Laticrete Intl.*, 264 A.D.2d 652 (1st Dept. 1999) ........................................................................................ 27

*Stutman v. Chem. Bank*, 95 N.Y.2d 24 (2000) .......................................... 30

*Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556 (2d Cir. 2011) ....... 9

*Toporoff Engineers, P.C. v. Fireman's Fund Ins. Co.*, 371 F.3d 105 (2d Cir. 2004) ........................................................................................ 47

*Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140 (2d Cir. 2014) ..................... 54

*United States v. Ford*, 840 F. 2d 460 (7th Cir. 1988) ................................ 40

*United States v. Kopp*, 2007 U.S. Dist. LEXIS 37533 (W.D.N.Y. May 23, 2007, No. 00-CR-189A) ................................................................................ 40

*United States v. Landau*, 155 F.3d 93 (2d Cir. 1998) ............................... 35

*United States v. Melendez*, 57 F.3d 238 (2d Cir. 1995) ............................. 41

*United States v. Various Arts. of Obscene Mdse., Schedule No. 615*, 1995 U.S. Dist. LEXIS 7019 (E.D.N.Y. Apr. 26, 1995, 95 CV 0584 (ARR) ...................... 34

*Villalba v. Rockford Sys.*, 2006 U.S. Dist. LEXIS 11470 (E.D.N.Y. Feb. 10, 2006, No. 02-CV-4455 (ARR) (RML) ............................................................. 53

*Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 231-32 (2d Cir. 2000) ......... 8

*Williams v. Apple Inc.*, 2017 U.S. Dist. LEXIS 229913 (E.D.N.Y. Oct. 26, 2017, No. 15 CV 07381) ....................................................................... 20, 31

## **RULES**

Fed. R. Civ. P. 50 ............................................................................. 9

Fed. R. Civ. P. 50(a)(1) ..................................................................... 8

Fed. R. Civ. P. 59 ......................................................................... 7, 34

Fed. R. Civ. P. 59(a)(1)(A) ................................................................ 34

Fed. R. Civ. P. 59(e) ....................................................................... 34

Federal Rule of Civil Procedure 50(b) ................................................... 8

Federal Rules of Civil Procedure 6(b)(2) ............................................... 7

Rule 50(a) .................................................................................... 8

Rule 59(a)(1)(A) ............................................................................ 35

## JURISDICTIONAL STATEMENT

The United States District Court for the Eastern District of New York had subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 based on diversity of citizenship.

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 because this is an appeal from a final decision of the District Court after a jury verdict.

## COUNTER-STATEMENT OF THE ISSUES

1.     Whether the District Court erred by denying BMW's Rule 50(b) motion for a directed verdict dismissing Boateng's GBL 349 claim?

Proposed Answer: No, the District Court did not err.

2.     Whether the District Court erred by denying BMW's Rule 59 motion for a new trial on Boateng's GBL 349 claim?

Proposed Answer: No, the District Court did not err.

3.     Whether the District Court erred by denying BMW's Rule 59 motion for remittitur or a new trial on damages?

Proposed Answer: No, the District Court did not err.

## COUNTER-STATEMENT OF FACTS

Plaintiff-Appellee, Godwin Boateng ("Appellee" or "Boateng"), commenced this products liability action against BMW ("Appellants" or "BMW") on January 13, 2017, in response to the injuries he sustained on July 6, 2016 due to Appellants'

dangerous soft close automatic door ("SCAD") feature equipped on the 2013 BMW X5 marketed and sold to him by Appellants, and which was unknown to him at the time. On or about December 20, 2013, Appellee Boateng purchased his 2013 BMW X5 vehicle. Boateng has been a successful software engineer who frequently presented system designs all over the country and earned approximately $250,000.00 per year prior to the accident.

On July 6, 2006, Boateng exited his vehicle parked outside his friend's home in Farmingdale, located on a residential street wide enough where only one vehicle could safely pass at a time. (JA-194). With his back to the driver side door to allow the truck to safely pass by, Boateng's right hand was positioned behind his back while holding the door – with most of his fingers resting on the handle and his thumb in the door column – as he tried to prevent the door from interfering with oncoming traffic. (JA-200-202, JA-2115).[1] With no warning, the door automatically closed on his right thumb and immediately amputated it. (JA-212). The gruesome photographs of Boateng's half-severed thumb were moved into evidence at trial. (JA 1676-1680). Boateng emphasized that he did not apply any force to close the door. (JA-205). Rather, upon gently moving his door back within a few inches of the

---

[1] Plaintiff's Exhibit 126 (JA-2115), which was a video reenactment of Boateng exiting his vehicle and handling the door in the same manner as he did on July 6, 2016, was played for the jury dozens of times throughout the trial. Boateng testified that he did not apply any force to close the door. (JA-205).

doorframe, the SCAD automatic motor activated and suctioned the door to its "lock" position while Boateng's thumb was still in the door gap. Prior to the accident, Boateng did not know his vehicle door could automatically close from the second-latch lock position. (JA-186). In their appellate Brief, the Appellants continue to blame Boateng for having "closed the driver's door onto his right thumb, amputating the tip," and stress the need for Boateng to "admit his own fault." *See* Appellants' Br. 3. However, the trial record is clear that SCAD indiscriminately caused Boateng's injuries and that information concerning its dangers was not disclosed to him prior to this preventable accident. (JA-214)

The trial in this action commenced on June 17, 2024, and concluded on June 26, 2024, resulting in a verdict in favor of Boateng. At the conclusion of the trial, the jury was charged with deciding Boateng's four (4) causes of action for (1) design defect; (2) failure to warn; (3) breach of implied warranty and Magnuson Moss Warranty Act; and (4) a violation of GBL 349. Prior to their deliberations, the Court dismissed Boateng's claims for punitive damages. An eight (8) member jury[2] unanimously found by a preponderance of the evidence that BMW engaged in unfair and deceptive practices in violation of GBL § 349. The jury awarded Boateng

---

[2] In the April 12, 2024 Joint Pretrial Order ("JPTO"), the parties stipulated that the verdict be unanimous by only six jurors, and that the two "alternate jurors shall not be present during deliberations." *See* ECF Doc. No. 159, pg. 6, ¶ 6. In light of this agreement in the JPTO, all eight (8) jurors were present and deliberated in the verdict.

$800,000 in damages for past pain and suffering, $850,000 in future pain and suffering, and $255,360 in past loss of earnings. (JA-2667, SPA-39). The jury also carefully considered each party's comparative fault and determined that BMW was 100% liable—and Boateng was 0% at fault—for the accident. (JA-2667). After the District Court published the verdict, it polled each of the eight jury members, who confirmed it was their own true verdicts. (JA 1659-1660).

Prior to the jury's deliberations, and after Boateng rested on June 24, 2024, BMW moved for a directed verdict pursuant to Federal Rules of Civil Procedure § 50(a). (JA-1172-1204). The District Court reserved its decision. (JA-1181, 1188, 1249). The next day, after BMW rested on June 25, 2024, its counsel briefly restated they had a "renewed directed verdict motion" which was "all briefed out." (JA-1474-1475). BMW offered no additional arguments in favor of dismissal of the GBL § 349 claim on June 25, 2024, but rather focused their arguments on Boateng's punitive damages claim. (JA-1475-1492). Following the District Court's publication of the jury verdict on June 26, 2024, the Appellants made no additional applications to the District Court other than to renew its motion for a directed verdict.

On July 29, 2024, Appellants filed their post-trial motion pursuant to Fed. R. Civ. P. 50, as well as Fed. R. Civ. P. 59 for a new trial on the GBL 349 claim, and for remittitur or a new damages trial. (JA-2609). A significant portion of the Appellants' post-trial motion was focused on BMW's incredulous belief that the

jury's GBL 349 verdict was somehow inconsistent with its dismissal of the failure to warn claim; a theory which BMW has now abandoned in this appeal. (JA-2620, 2640). On October 11, 2024, the District Court issued a 102-page Memorandum & Order ("Order") denying all branches of Appellants' post-trial motion and granting Boateng a Bill of Costs. (SPA 40-141). In a critical blow to the Appellants' Fed. R. Civ. P. 59 motion, the District Court concluded that BMW, at the very least, failed to object and preserve the record, and thus waived all opportunities to move for a new trial. (SPA 92-94).

## SUMMARY OF THE ARGUMENT

For the most part, the Appellants take their failed post-trial motions and repackage them in this appeal. They have added nothing other than removing the argument that the failure to warn dismissal was inconsistent with the GBL 349 verdict. However, the District Court carefully considered all of BMW's arguments and correctly denied its Fed. R. Civ. P. 50 and Fed. R. Civ. P. 59 motion. The District Court's detailed 102-page Order is well-reasoned and supported by the evidence adduced at trial and persuasive authority. Much to their chagrin, neither the jury nor the District Court was persuaded by the Appellants' recycled, stale and ill-fated tactics of BMW's disclaimer of liability. In this appeal, BMW makes improper and unfounded assumptions about the jury's conclusions based wholly on its own *reinvented, imaginary and wishful interpretations* of the evidence. BMW's attempts

to rewrite the narrative in their papers are belied by the trial record and the actual evidence and testimony the jury heard and considered in its deliberations. BMW also shamefully continues to hurl personal *ad hominem* attacks against Boateng and his counsel and insists that the jury was misled by Boateng's creation of a discovery dispute at trial. *See* Appellants' Br. 40-41. This argument reeks of desperation. There was no discovery dispute suggested to the jury. Nor was the jury aware of the substance of the sidebar discussions with the judge.

BMW raises for the first time on appeal that the District Court's pretrial rulings limited Boateng's use of other BMW injury claims to the issue of notice only. It then claims that Appellee's counsel improperly used the numbers *reported by BMW* to imply to the jury that these numbers were inconsistent. *Id*. Frankly, the numbers were inconsistent. However, only BMW is to blame for its failed trial strategy. As the District Court concluded, BMW "made a strategic decision to limit the scope of their response to Plaintiff's interrogatories in discovery, and that strategic decision provided Plaintiff with an opportunity to question Defendants' witnesses regarding the differing numbers at trial." (SPA 109). By no means, however, was BMW's inconsistent reports the basis of BMW's "deceptive act" under GBL 349, which Boateng asserted and successfully demonstrated at trial. (SPA 110).

Incredibly, to this day, BMW maintains that Boateng was the party at fault and that the SCAD feature was perfectly safe. It is not. Even after the trial concluded and the jury rejected BMW's comparative fault arguments—finding instead that BMW was 100% at fault and Boateng was 0% at fault—BMW refused to accept the jury's findings and the District Court's Order. The Appellants now resort to a "Pandora's Box" argument and suggest that the District Court's Order would "create a new, impracticable, and clearly unintended standard for product manufacturers," which may somehow unleash a flood of similar cases and overwhelm the courts. *See* Appellants' Br. at 5. This argument, too, fails, as this case was adjudicated *on the merits* rather than on the hypothetical future claims BMW asks this Court to consider.

There were no errors. As such, the District Court's Order must be affirmed, as BMW has not demonstrated any error other than its expected rejection of losing.

## ARGUMENT

### I. THE DISTRICT COURT SHOULD BE AFFIRMED, AS BOATENG PROVED AT TRIAL THAT BMW VIOLATED GBL § 349 BY A PREPONDERENCE OF THE EVIDENCE

#### A. The Appellants' Post-Trial Motion Under Rule 50 and Rule 59 was Untimely.

The Appellants' post-trial motion under Federal Rules of Civil Procedure 50 and 59 was untimely pursuant to Federal Rules of Civil Procedure 6(b)(2), as it was filed on July 29, 2024 (JA 2609-2610); more than 28 days after the entry of the jury

verdict on June 26, 2024. *Legg v. Ulster County*, 979 F.3d 101, 112 (2d Cir. 2020) ("A district court may, on occasion, inadvertently rule in such a way as to extend a deadline to file a post-trial motion under Rules 50(b) and 59(b) past the 28-day mark despite the prohibition in Rule 6(b)(2)"). *See also*, *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 231-32 (2d Cir. 2000) ("we conclude that the District Court lacked the power to extend [appellant's] time to file its post-trial motion beyond the [time] provided for in the Federal Rules of Civil Procedure"). Inasmuch as the Appellants filed their post-trial motion beyond the allowable 28-day deadline, it was untimely.

### B. *Legal Standard for Directed Verdict Motion*.

Notwithstanding BMW's untimely post-trial motion, it is axiomatic that a "party moving for judgment as a matter of law pursuant to Rule 50(a) 'must specify the grounds upon which the motion relies.'" *Barkley v. United Homes, LLC*, 2012 U.S. Dist. LEXIS 85793, at *25 (E.D.N.Y. June 20, 2012, No. 04-cv-875) (citing *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53-54 (2d Cir. 1993)). Under Rule 50(a), a court is permitted "'during a trial' and once 'a party has been fully heard on an issue' to 'grant a motion for judgment as a matter of law against that party.'" *Broadnax v. City of New Haven*, 415 F.3d 265, 268 (2d Cir. 2005) (citing Fed. R. Civ. P. 50(a)(1).) Conversely, "Rule 50(b) allows a party to make a motion for judgment as a matter of law <u>after</u> the jury has returned its verdict." *Id*. (emphasis added).

In the context of a Rule 50(a) motion, a court must "consider the evidence in the light most favorable to the party against whom the motion was made and . . . give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020). "A district court may grant judgment as a matter of law only if it finds that 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party.'" *Lexington Furniture Indus. v. Lexington Co.*, 2023 U.S. App. LEXIS 34154, at *3 (2d Cir. Dec. 26, 2023, No. 22-2993) (citing Fed. R. Civ. P. 50). In other words, a motion under Rule 50 "may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011) (quotations omitted). *See also, Noonan v. Midland Capital Corp.*, 453 F.2d 459, 461 (2d Cir. 1972) ("The motion will be granted only if (1) there is a complete absence of probative evidence to support a verdict for the non-movant or (2) the evidence is so strongly and overwhelmingly in favor of the movant that reasonable and fair minded men in the exercise of impartial judgment could not arrive at a verdict against him.").

Similarly, a renewed Rule 50(b) post-verdict motion for judgment as a matter of law may be granted "[o]nly if there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against [the moving party]. . . . The same standard governs appellate review of a decision . . . denying judgment as a matter of law." *Koch v. Greenberg*, 626 F. App'x 335, 337 (2d Cir. 2015).

BMW cannot, and does not, argue that that the jury's findings were the result of sheer surmise and conjecture, or that there was such an overwhelming amount of evidence in favor of BMW that reasonable and fair-minded people could not have arrived at the verdict that was reached against BMW. Stated simply, the Appellants have failed to meet this high threshold necessary to overturn a carefully deliberated jury verdict by eight unanimous jurors who considered lost wages, past pain and suffering, future pain and suffering and the comparative fault for each party. Based on the foregoing, the District Court properly denied BMW's Rule 50 motion.

### C. The Elements of a GBL 349 Violation.

To state a claim under GBL 349, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or

-10-

practice." *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941, 967 N.E.2d 675, 944 N.Y.S.2d 452 (2012). "Intent to defraud and justifiable reliance by the plaintiff are not elements of the statutory claim." *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 55 (1999). When evaluating if an act was deceptive or misleading, "New York courts apply an objective standard, asking whether the representation or omission is 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Paradowski v. Champion Petfoods USA, Inc.*, 2023 U.S. App. LEXIS 13982, at *5 (2d Cir. June 6, 2023, No. 22-962-cv). To that end, "the New York Court of Appeals has adopted an objective definition of 'misleading,' under which the alleged act must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007) (citation omitted). As it concerns GBL 349, it is implicit that companies "have some latitude when marketing their products, but there are limits." *MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 95 (2d Cir. 2023).

As an initial matter, the District Court correctly decided that BMW "failed to meet [the] stringent standard" necessary to succeed on a directed verdict, which would include "'such a complete absence of evidence supporting the verdict . . . or the evidence in favor of the movant is so overwhelming that reasonable and fair-

minded persons could not arrive at a verdict against it.'" (SPA-64) *citing Kinneary v. City of New York*, 601 F.3d 151, 155 (2d Cir. 2010).

BMW argues that the jury could not have reasonably found BMW's conduct in failing to disclose the risk of injury posed by SCAD as materially misleading. This is plainly false. Boateng successfully proved the second element of GBL § 349 (materially misleading). The jury could reasonably have concluded that BMW's conduct in failing to disclose the risk of injury posed by the soft-close mechanism was materially misleading. (SPA-66). Further, the District Court correctly noted that the evidence presented at trial, including testimony about the forces exerted by the soft-close mechanism and the lack of adequate warnings supported the jury's finding that BMW's omissions were materially misleading. (SPA 66-69). The District Court rejected BMW's argument that no warning was necessary, finding instead that the function of the soft-close door mechanism was not a matter of common sense, and that it required further warning or explanation from BMW. (SPA 68-69). The warnings which BMW provided, including the manuals containing the words "pinching" and "injuries" were not sufficient; a conclusion which the jury plausibly reached. (SPA 72-73).

BMW also failed to demonstrate they were entitled to a directed verdict based on the third element of GBL 349. The District Court found that there was sufficient evidence for the jury to conclude that BMW's deceptive acts caused Boateng's

injuries. The District Court highlighted that Boateng testified he was unaware of the soft-close feature's potential danger and that BMW did not inform him of any risks associated with the feature. (SPA 86). The jury could have reasonably inferred that Boateng would not have purchased the vehicle with the soft-close feature if the risks had been disclosed to him, thus establishing causation. (SPA 87). It was BMW's omission of material information, including the more than 44 claims and the risk of amputation, which caused Boateng's injury. (SPA 87). Accordingly, the evidence at trial was sufficient for the jury to return a verdict in favor of the Appellee under GBL § 349, and the District Court properly denied BMW's motion for judgment as a matter of law.

### D. BMW Failed to Object to the Jury Instructions or Verdict Sheet at the Charging Conference

BMW sheepishly argues that the "evidence at trial failed to provide a foundation upon which any reasonable jury could infer facts sufficient to hold BMW liable under GBL 349." *See* Appellants' Br. at 9. However, both parties reviewed the proposed jury instructions and verdict sheets and were afforded the opportunity to raise objections at the jury charging conference which took place on June 18, 2024 (JA 419-467), and again on June 26, 2024 (JA 1535-1542). BMW failed to preserve any objections concerning the validity of the GBL 349 claim in the jury charges or verdict sheet.

### E. *Boateng Demonstrated Evidence of Appellants' GBL 349 Violation.*

Appellants' reliance on *Okemo Mountain, Inc. v. Sikorski*, 303 F. App'x 938 (2d Cir. 2008), where this Court reversed the District Court of Vermont's denial of a Rule 50(b) motion for judgment as a matter of law, is misplaced. In *Okemo*, the District Court itself noted the "recent twist" in the case when the jury awarded the *Defendant/Counter-Claimant* $650,000 in compensatory damages, including intentional infliction of emotional distress. *Okemo Mountain, Inc. v. Sikorski*, 2006 WL 335858, No. 1:93-CV-22 (D. Vt. Nov. 16, 2006). The Vermont District Court granted the movant's Rule 50(b) motions on all claims except for the intentional infliction of emotional distress. This Court reversed because Sikorski failed to demonstrate that there was "outrageous conduct" on the part of Okemo "to sustain a claim for IIED." *Okemo Mtn., Inc. v. Sikorski*, 303 Fed. Appx. at 940. Specifically, this Court concluded that there was "no evidence that Sikorski was aware of [the plan to attach the estate of Sikorski's terminally ill mother] prior to trial, [] which forecloses the possibility that the plan actually or proximately caused Sikorski distress." *Id.* at 941. Accordingly, *Okemo* is factually distinguishable from Boateng.

The remaining arguments in BMW's opposition to the jury and District Court's findings are similarly unavailing. Appellants argued at trial that "common sense" and "facts of life" should have alerted Boateng as to the dangers of having his thumb amputated. *See* Appellants' Br. at 10. Those theories, however, were

-14-

rejected by the District Court (SPA 67-68) and jury, and denied by Boateng. (JA 342, 347-348, 352-356[3]). Boateng expressly testified he did not know what the soft-close feature was at the time he purchased his BMW vehicle. (JA 327). He further testified that no one at the dealership informed him about the soft-close feature either. (JA 336). Regardless, even if he learned about SCAD *after* his purchase, he "never believed it could do such a [sic] damage." (JA 392).

### 1. Boateng Established BMW's Conduct was "Materially Misleading" under GBL 349 at Trial

BMW had a fair opportunity to adequately prepare and present a defense at trial. BMW now seeks to upend the verdict of eight (8) impartial jurors who had the opportunity to hear and weigh evidence and make determinations concerning the credibility of witnesses. The District Court correctly recognized that "based on the evidence in the record and the jury charges regarding the GBL § 349 claim, the jury could reasonably have found BMW's conduct in failing to disclose the risk of injury posed by the soft-close mechanism to be materially misleading," and thus, judgment as a matter of law was not warranted based on the second element of GBL § 349. (SPA-65).

Neil Guthrie testified that SCAD provided no safety benefit other than possibly eliminating the force of having to slam a non-SCAD door and noise

---

[3] Appellants wasted a significant amount of time during their cross-examination of Boateng exploring possible past injuries related to a house door when he was a child.

reduction. (JA 975-976). One of the primary differences between a soft-close equipped BMW door and a non-SCAD vehicle is the SCAD's closing forces. In fact, Appellants' own witnesses, Klaus Bruecklmeier[4] and Donald Parker[5], confirmed that the force of SCAD was more than double than that required to fracture a thumb for a non-SCAD door. (SPA-68-69). Mathew Greenston, Appellants' biomechanical engineer, testified that SCAD generates approximately 200 lbs. of force, which would only *increase* at closure if it met resistance, such as Boateng's thumb.[6] (JA 906-907, 912-913). When shown Plaintiff's Exhibit 126— Boateng's video demonstration as to how the accident occurred (JA-2115)— Greenston further acknowledged that Boateng did not push the car door, that "he releases the door and there's a little hiccup when the soft-close engages, and then it closes." (JA-910). For Greenston, it was entirely foreseeable that Boateng's thumb was amputated within the door frame. (JA-927).

Donald Parker, too, acknowledged that he did not observe Boateng to have pushed the door in the video demonstration published to the jury countless times.

---

[4] Bruecklmeier testified that it takes roughly 100 lbs. or 445 newtons of force to fracture a thumb, but that SCAD generated between 600-1000 newtons (JA 1051, 1057, 1074), which is more than double the force generated.

[5] Parker conceded that the force of SCAD was "significant" and generated up to 285 lbs. of force. (JA 1328). He testified that it takes 50 lbs. to close a non-SCAD door. (JA-1338).

[6] Greenston testified that if SCAD's "job is to close the door and it's meeting resistance, and it has the ability to draw more current to continue increasing force to close, then it will." *Id*. at JA-907.

-16-

(JA-1330). Based on Parker's testimony, it follows that if a consumer, like Boateng, was not trying to close a SCAD-equipped door, but was holding it within 6 millimeters, "there's going to be an increase in the force at that position," beyond that of a non-SCAD door. (JA-1332). Without any plausible explanation, however, Parker believed that a person would actually have to squeeze his or her own finger *in order for the soft-close to engage*. (JA 1333-1335). This theory made no sense to the judge and jury.

Based on Appellants' own witnesses' respective testimonies, their defense of "common sense" and that Boateng should have understood "the universally known 'fact of life' that fingers and body parts need be kept clear of the path of closing doors, else one could be injured," were appropriately rejected by the jury and the District Court. *See* Appellants' Br. at 10. BMW propounded these defense strategies at trial, but they did not work. Eight jurors heard and considered BMW's arguments as to why people should keep their hands out of the path of a closing door. All eight spurned BMW's efforts to absolve liability. BMW's conduct, particularly in failing to disclose the risk of injury posed by the soft-close mechanism, was materially misleading and was a plausible basis for the jury's GBL 349 verdict.

BMW recognized that automatic windows have sensors yet <u>do not</u> injure consumers. (JA 980-981). Both Guthrie and Bruecklmeier testified that BMW never looked into installing sensors in SCAD. (JA 982-983, 1135-1136). Guthrie

also testified that BMW provided no other warnings, either through the dealership or documentation about the possibility of a SCAD injury other than the Owner's Manual, which is typically stuffed in a glove compartment. (JA 1000-1002). BMW admitted it did not change the way it communicated its warnings to consumers. (JA 1002-1003).

As it relates to injuries to other consumers, Guthrie acknowledged he testified at his deposition that he was aware of only two SCAD incidents. (JA 984). However, when introduced Court Exhibits 1 and 2 at trial, Guthrie acknowledged there were 25 claims. (JA 992-993). Immediately after recognizing his blunder, Guthrie then read to the jury BMW's prior admissions in trial Exhibit 101, stating that "[s]ince the introduction of the SCA with the launch of the BMW E65 in 2001, 44 cases have been reported worldwide in which injuries of varying degrees to fingers that were in the closing area occurred when the SCA of the doors was activated. Three-quarters of these 44 cases were reported to us from the U.S.A." (JA 995) (citing trial Exhibit 101 (JA 2073).) Guthrie attempted to skirt around his embarrassing gaffe by suggesting that the 44 cases may have post-dated Boateng's injury, but he quickly backtracked and realized he could not "right the ship." (JA 995-997). Despite BMW's bungled testimony concerning the number of claims BMW knew about, this Court ruled that "[i]t is the jury's job to find the facts." (JA 999). It is respectfully submitted that the jury did just that.

-18-

Critically, the jury heard Guthrie testify that the insufficient warnings in the owner's manual existed at the time each of the 44 claimants was injured. (JA 1003). Based on the evidence presented, the jury likely concluded, as one of several considerations, that BMW suppressed vital information which could have prevented Boateng's injury from occurring.[7] In their appeal, BMW attempts to explain their inconsistencies by stating that the "discovery process was long and contentious, but was carefully monitored by Magistrate Judge Locke." *See* Appellants' Br. at 35 n.1. Although this point has nothing to do with the issues on appeal, BMW conveniently omits mention of the fact that on October 31, 2018, Magistrate Judge Locke granted in part Boateng's motion for contempt against BMW for their failure to follow the Court's June 6, 2018 discovery orders. *See* ECF Doc. Nos. 50 and 62.

### 2. *The Evidence Adduced at Trial Makes Clear that BMW Possessed Crucial Information and Knowledge concerning the Dangers of SCAD, which it otherwise Suppressed and Concealed*

As made clear in the trial exhibits showing BMW's communications with the German regulatory agency, the KBA, BMW alone possessed the material information necessary for Boateng to have known concerning the dangers of SCAD. BMW failed to disclose this information. The KBA documents consisted of trial exhibits 98 through 107. JA 2055-2108. These exhibits were published and

---

[7] The Appellants incorrectly argue on appeal that the discrepancy in the number of reported claims was the basis of Boateng's GBL 349 claim and a showing of BMW's deception. *See* Appellants' Br. at 34-36.

displayed on a big monitor to the jury countless times at trial. The jury also heard extensive testimony concerning BMW's knowledge and role in the investigation with KBA. The jury formulated their own conclusions about BMW's knowledge. Without question, "courts may take into account the parties' relative bargaining positions and access to information, and "when a defendant exclusively possesses information that a reasonable consumer would want to know and could not discover without difficulty, failure to disclose can constitute a deceptive or misleading practice." *Williams v. Apple Inc.*, 2017 U.S. Dist. LEXIS 229913, at *6 (E.D.N.Y. Oct. 26, 2017, No. 15 CV 07381) (internal citations omitted). Furthermore, BMW's suggested Pandora's Box plea to this Court would actually create an adverse effect on consumers and "validate highly deceptive marketing." *Mantikas v. Kellogg Co.*, 910 F.3d 633, 638 (2d Cir. 2018).

Even if he knew about the dangers of SCAD prior to his accident—which he did not—Boateng "could not reasonably have obtained the relevant information [he] now claim[s] [BMW] failed to provide." *Paradowski v. Champion Petfoods USA, Inc.*, 2023 U.S. App. LEXIS 13982, at *6 (2d Cir. June 6, 2023, No. 22-962-cv). Boateng testified that at the time of his purchase, he had no idea what SCAD was. (JA 186). He certainly could not have purchased his vehicle equipped with SCAD when he did not know what it was or was apprised about its risks. Additionally, he

testified that between the time of his discovery of SCAD in his vehicle and the time of his accident, he "[n]ever actually used" SCAD. (JA 190).

More importantly, Boateng did not know how SCAD operated or *when* an automatic closure would occur. This is critical, as Boateng testified that he did not know the door was closing at the time of the accident.[8] (JA 322, 393). He did not intend to close the door and did not feel the door coming to a closed position when his hand was on the door as it was automatically closing.[9] (JA 393). Boateng relied upon BMW's advertisements for the X5 model when he purchased the vehicle, but the literature did not warn or inform him about the dangers of SCAD. (JA 327). The smaller manual which Boateng reviewed around the time of his purchase similarly did not contain any SCAD warnings. (JA 389-390). Boateng believed that he did not need to review the large owner's manual containing the bareboned "danger of pinching" warning, because he "knew how to drive a car, and [he] really didn't have to go through a user's manual." (JA 390). Regardless, neither the advertisements nor the owner's manual referenced the possibility of injuries. Nor did they contain the details gleaned from the KBA investigation.

---

[8] Contrary to BMW's representations that Boateng informed Tonya Perry and her son that the vehicle was equipped with SCAD, *see* Appellants' Br. at 12, Boateng refuted that notion and testified that he "did not inform her," but rather believed Perry and her son may have "observed" the doors closing on their own. (JA 354).

[9] In response to viewing Boateng's video demonstration exiting his vehicle—trial Exhibit 126—Boateng testified that he did not touch the door, but that it "just close[d] on its own." (JA 394).

Rather than accept the undisputed fact that consumers were injured as a result of SCAD, BMW defiantly resisted those innuendos and shamelessly <u>blamed the consumers, like Boateng</u>, for closing the doors on their own fingers.  Further, their defense that people should know not to leave their hands in the path of a closing door is not only condescending but is also nonsensical.  Boateng testified he did not know the door was closing since he was never informed by BMW about the operation of SCAD or its potential to amputate and inflict serious injury.

Neil Guthrie specifically blamed another injured consumer, Larry Connor, for his amputation despite not even speaking with Mr. Connor.  (JA 1021).  Similarly, BMW blamed Boateng for causing his own injuries despite ample evidence suggesting that injured consumers had no knowledge SCAD activated on its own without prior warning.  *See* Appellants' Br. at 3 ("Boateng closed the driver's door onto his right thumb").  In light of BMW's blame game, even Guthrie conceded— after watching Boateng's video demonstration (trial Exhibit 126)—that Boateng <u>did not</u> close the door on himself and that it was "possible" the door could close due to "a gravity effect that would pull it closed."  (JA 1021-1022).  Again, BMW's newfound realization was never shared with Boateng prior to his injury.

Like Guthrie, Bruecklmeier had no sensible response to the inconsistency in the reported number of injuries, especially in Germany, where BMW previously admitted to the KBA they were aware of 11 claims in Germany despite a lower figure

it previously reported. (JA 1122-1123). In fact, only when presented with Trial Exhibit 102 did Bruecklmeier admit that additional claims were reported upon request by the KBA. (JA 1141). However, Bruecklmeier further conceded that BMW was aware *as early as 2001* that consumers "may be getting hurt." (JA 1106). In light of this vital information, BMW did not inform TUV, the agency it retained in connection with implementing safety protocols, about consumer injuries. (JA 1144). BMW's lack of disclosure as to the risks of injury, even to TUV, strongly suggested that its conduct was materially misleading, and that they were intentionally suppressing critical safety information only BMW knew about.

Although BMW alone possessed information concerning the dangers of SCAD, it doubled down on those deceptive practices by diluting the significance of potential injuries and using insufficient warning language, like "danger of pinching," in its manuals. *Koch v. Greenberg*, 626 F. App'x 335, 338 (2d Cir. 2015) ("New York courts have held that whether a defendant has peculiar knowledge that defeats a specific disclaimer, thus establishing justifiable reliance, is a matter of fact for the jury"). Even Bruecklmeier admitted that the use of the "danger of pinching" warning in English did not correlate well with its intentions in the German language. (JA 1110-1111) ("What does the word zwicken, you said, meaning pinch, right? And you demonstrated to the jury, taking flesh between your fingers and pulling it, right?" while the word "einklemmen" meant "[w]ith a lot of force between two items

to -- to be there and possibly not be able to pull out by yourself. Or at least to have -- do it with pain").

Contrary to Bruecklmeier's own explanation of the distinction between a "pinch" and a more significant injury, BMW confoundingly argued in its post-trial motion and in this appeal that "[n]otwithstanding counsel's effort at trial to *ridicule and confuse* what was being conveyed to the consumer by such warnings, *BMW clearly was not conveying to the public that the severity of potential injury was at most a 'pinch*.'" *See* JA-2627 and Appellants' Br. at 14-15 (emphasis added). However, this is *precisely* what BMW was doing and the jury noticed it. Notably, with respect to the failure to warn claims in the verdict sheet, the jury concluded that BMW "failed to provide adequate warning of dangers associated with the soft-close equipped door which BMW knew or should have known." (JA 2664).

BMW's lack of transparency did not stop there. Bruecklmeier's unacceptable response to a scenario where someone whose finger was entrapped and injured was that the person could "stop it at any time…after the process starts." (JA 1127). The absurdity of that statement is effectively admitting there is no solution since the consumer has been injured already. Additionally, Bruecklmeier testified that a person "standing outside the vehicle cannot read the manual," and thus, could not be properly warned of its dangers. (JA 1132). In fact, only BMW was aware of and had knowledge of this information. Boateng certainly had no knowledge that the

door would close on him. Bruecklmeier finally conceded, after he was examined about the KBA's troubling correspondence with BMW, that a "finger can only be injured if the finger is in the door gap," which was how Boateng's injury occurred. (JA 1133). Despite being aware of this empirical data, BMW defiantly resisted placing a sticker around the door or installing a beeping sound upon closing. That was because BMW was "**convinced it is a safe system and there is no reason to warn of the function**." (JA 1134-1135). (strong emphasis added). BMW also did not consider delaying the soft-close door activation time so as to give a consumer like Boateng the opportunity to move his hand prior to an injury. (JA 1137). BMW also flatly rejected the recommendations by the KBA to reduce the maximum gap door protrusion to 4 millimeters. (JA 1146).

In his own words, Bruecklmeier tellingly conceded a SCAD injury may have been foreseeable insofar as "it is not proven or clear whether soft-close, per se, is capable of causing injuries. It is -- it is only clear that the vehicles where those injuries took place did happen to have a soft-close unit." (JA 1148). Critically, he also testified that it would be a reasonable and "fair expectation for Mr. Boateng to rely on BMW's knowledge about the safety of the vehicle and the soft-close doors." (JA 1149). Despite this admission, BMW conceded knowledge of prior injuries when it states that between 2001 and 2016, it "received 44 claims worldwide alleging finger injuries in connection with soft close activation…" *See* Appellants' Br. at 18.

BMW's attempts to reargue the safety benefits of its rubber seals, BMW's state-of-the-art products, and the lack of competitor's anti-trap sensor mechanisms are irrelevant and are nothing more than a desperate effort to distract the Court. *See* Appellants' Br. at 19-20. Appellants also raised for the first time on appeal their "simple mathematics" claims comprising of statistics BMW never raised at trial nor sought to introduce as evidence. *See* Appellants' Br. at 30.

Candidly, all of the above arguments are irrelevant for the purposes of this appeal. However, even if said issues were relevant, they were not previously raised as a basis of the Appellants' motion on June 24, 2024. For that matter, while BMW goes into great lengths arguing the details of "other complaints," *see* Appellants' Br. at 22-23, BMW filed a motion *in limine* to preclude Boateng from introducing evidence of "other incidents" at trial. In its Memorandum and Order dated April 8, 2024 ("*in limine* Order"), the District Court expressly ruled:

> to the extent Plaintiff seeks to offer the statements *only* for purposes of showing that BMW was on notice as to a potential design defect, the Court will admit records from Defendants' files showing the number of customer emails and the date ranges of the emails relating to customers' allegations that BMW's SCAD system resulted in injuries to the customers' thumbs or fingers.

> Accordingly, the Court finds that Exhibits I-381, I-41, I-42, I-43, I-44, I-45, I-46, I-47, I-50, I-51, I-52, I-81 (a duplicate of I-42), I-108, I-109, I-110, I-111, I-112, I-113, I-114, I-115, and I-116, which consist primarily of internal emails or documents summarizing or quoting customer complaints, are hearsay, but may be presented in summary form as described above to show notice to Defendants.

(SPA-13) (emphasis in original).

All of a sudden, when it stands to benefit them, BMW conveniently attempts to compare the particulars in the "other incidents" it fought so desperately to preclude in its motion *in limine*. BMW now incredulously argues that "Plaintiff never discussed the details of the other 42 claims." *See* Appellants' Br. at 30. Notwithstanding that these arguments were not raised at trial in the first place, BMW also did not raise them in their motion on June 24, 2024. Quite clearly, BMW frivolously now attempts to use the *in limine* Order as both a sword and a shield.

The cases which Appellants cite in support are also distinguishable. For instance, BMW offers dicta in *Leonard v. Abbott Labs., Inc.*, 2012 U.S. Dist. LEXIS 30608 (E.D.N.Y Mar. 5, 2012), for the proposition that the "mere existence of product complaints does not in and of itself prove that the product was unsafe." *Id*. at *70. Even if true, the Court in *Leonard* actually denied the defendant's motion to dismiss and concluded that the plaintiffs "stated viable claims" under GBL 349. *Id*. at *73.

In *St. Patrick's Home for the Aged & Infirm v. Laticrete Intl.*, 264 A.D.2d 652 (1st Dept. 1999), the First Department dismissed the plaintiff's complaint because it "failed to meet the threshold requirement of General Business Law § 349" and because the conduct complained of "did not constitute consumer-oriented conduct." *Id*. at 655. Likewise, *Bozick v. Conagra Foods, Inc.*, 2022 U.S. Dist. LEXIS 176919,

at *127 (S.D.N.Y. Sep. 28, 2022, No. 19-cv-4045), also cited by BMW, is distinguishable in that the plaintiff "failed to create a triable issue of fact as to Defendants' knowledge of the purported defect." The circumstances here are vastly different in that BMW unequivocally knew of the dangers of SCAD because they were investigated by the KBA about it. They made numerous admissions against interest to the KBA, including that since 2001, "44 cases have been reported worldwide in which injuries of varying degrees to fingers that were in the closing area had occurred when the SCA of the doors was activated. Three quarters of these 44 cases were reported to us from the USA." (JA-2073).

BMW also readily acknowledged that,

> [d]epending on how a finger is located in the door gap, it cannot be ruled out that the SCA would be mistakenly activated depending on the individual's anatomy and a correspondingly severe crushing. Whether the SCA could cause injury in the case depends on the anatomy, in turn, and essentially on how deep the finger is inserted into the door gap and how badly it was squeezed beforehand.

(JA-2090).

The jury likely concluded that with the proper dissemination of information to Boateng, his injury could have been avoided if he had known the door could close on its own several millimeters from the door frame while his finger was in the door gap. As here, BMW's concealment of the KBA investigations and reported injuries falls "within the purview of § 349" because "the deceptive acts or practices involve threats to public health or safety." *Fibermark, Inc. v. Brownville Specialty Paper*

-28-

*Prods.*, 419 F. Supp. 2d 225, 241 (N.D.N.Y. 2005). *See also, Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) ("Section 349…does provide a right of action to any person who has been injured by reason of any violation of this section") (citations omitted). Moreover, "the New York Court of Appeals has adopted an objective definition of 'misleading,' under which the alleged act must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007) (citation omitted). Boateng certainly met that burden here.

### 3. *Having Proved BMW's Materially Misleading Conduct, Boateng Successfully Proved he was Injured*

Justifiable reliance by a plaintiff on the misrepresentation or omission is not an element of a GBL 349 statutory claim. Boateng demonstrated that his personal injury was caused by the lack of awareness that the SCAD could result in amputation. The jury also found that had Boateng known SCAD could amputate or severely injure his finger beyond a "pinching," he would have acted differently.

At trial, Boateng conclusively testified that his injury was caused by SCAD and that he was never warned the door may close on his hand as it activated:

> Q. And can you state with certainty, as you sit here today, that the soft-close automatic door feature was responsible for closing on your thumb?
> A. Yes. Absolutely.
> Q. You didn't -- did you, at any point in time, slam the car door on your hand?
> A. No.

Q. How can you be certain that you didn't cause this injury to happen to yourself?
A. I can't imagine how you can slam the door on your finger and have that injury, not at that force. Certainly, not.
MR. KIM: Objection, Your Honor. Strike as nonresponsive.
THE COURT: I think it was a response to the question that was posed.
Q. And Mr. Boateng, in the time that you were backing up and the soft-close automatic door engaged, did you know the actual distance within which it would activate?
A. No.
Q. Did anyone ever explain this to you?
A. No.

(JA 213-214).

Mr. Boateng also testified that if he was informed, he would have acted differently. Since the time of his injury, however, Boateng is more careful around the vehicle:

Q. And do you continue to operate that vehicle?
A. Occasionally.
Q. And when you use the BMX X5 today, you take the precaution of making sure your fingers are not going to get caught in the door when you close it, correct?
A. **Because now I know what it can do**.

(JA 372) (emphasis added).

Under GBL 349, a "plaintiff must prove 'actual' injury to recover under the statute, though not necessarily pecuniary harm." *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000).) In this case, Boateng sustained a significant and life-altering injury to his hand due to BMW's soft close door. Having successfully proved that BMW's conduct was materially misleading, Boateng also set forth sufficient evidence of a

-30-

"cognizable injury" under GBL 349. *Jackson-Mau v. Walgreen Co.*, 652 F. Supp. 3d 349, 361 (E.D.N.Y. 2023) (a plaintiff must "adduce evidence of having suffered a cognizable injury"); *Nick's Garage, Inc. v. State Farm Gen. Ins. Co.*, 2013 U.S. Dist. LEXIS 26654, at *26 (N.D.N.Y. Feb. 27, 2013, No. 5:12-cv-633) ("Plaintiff has adequately pleaded that its injury caused by the deceptive act is independent…"); *Williams v. Apple Inc.*, 2017 U.S. Dist. LEXIS 229913, at *9 (E.D.N.Y. Oct. 26, 2017, No. 15 CV 07381) ("The New York Plaintiffs have sufficiently pleaded injury in that they claim iOS 9 irreversibly destroyed, or greatly diminished the value of, their device").

Based upon these reasons, the District Court correctly denied the Appellants' Motion for Directed Verdict.

## II. BMW'S MOTION FOR A NEW TRIAL PURSUANT TO FRCP 59 WAS PROPERLY DENIED

BMW argues that a new trial under FRCP 59 was warranted based on three reasons: (1) the GBL 349 verdict was against the weight of the evidence; (2) BMW was purportedly prejudiced by the Boateng's use, over BMW's objections and the District Court's pretrial rulings, of a discovery dispute to manufacture an alleged deception under GBL 349; and (3) the damages awarded by the jury was excessive,

thus warranting a remittitur or a new trial on damages.[10]

BMW's arguments in support of a new trial fail and their post-trial motion was properly denied. First, BMW does not *adequately identify* what about the verdict was "against the weight of the evidence." Instead, BMW simply posits that "for all the same reasons discussed in BMW's appeal of the directed verdict motion," the District Court "should have freely weighed the trial record, and in so doing, determined that the jury's verdict on the GBL 349 claim was seriously erroneous, such that a new trial was warranted." *See* Appellants' Br. at 39.

Second, at trial BMW did not actually object to the use of the exhibits it believed was at the heart of any "discovery dispute." Besides, the District Court expressly ruled on the admissibility of said exhibits at trial and in its *in limine* Memorandum and Order. Any objections by BMW as to Boateng's presentation and delivery of the exhibits were properly overruled.

Third, BMW cannot argue that the damages awarded were excessive, as BMW failed to call its own expert, Dr. Jack Choueka, as a witness to rebut Boateng's damages claims.

Fourth, the District Court did not abuse its discretion in denying Appellants' Rule 59 motion. The District Court consistently followed and enforced its pretrial

---

[10] Appellants have now abandoned the claims raised in their post-trial motion that the GBL 349 verdict was internally and irreconcilably inconsistent with the jury's dismissal of the Failure to Warn claim. (JA 2640-2641).

evidentiary rulings.  In fact, the only party who attempted to circumvent the District Court's pretrial rulings was BMW, by arguing that "Boateng never discussed the details of the other 42 claims" in the Other Similar Incidents ("OSI").  *See* Appellants' Br. at 30.  In its April 8, 2024 Memorandum and Order to the parties' motions *in limine*, the District Court ruled that "to the extent Plaintiff seeks to offer the statements only for purposes of showing that BMW was on notice as to a potential design defect, the Court will admit records from Defendants' files showing the number of customer emails and the date ranges of the emails relating to customers' allegations that BMW's SCAD system resulted in injuries to the customers' thumbs or fingers." (SPA-13).[11]  Appellants do not claim that Boateng tried to violate the District Court's April 8, 2024 Order and introduced evidence at trial concerning causation of the OSIs.

Finally, BMW made no substantive or procedural objections during the charging conference as to the GBL 349 claim, and thus, failed to properly preserve their rights on appeal.  Instead, BMW now seeks to take a "second bite at the apple." Where, as here, the District Court appropriately denied BMW's Rule 50(b) motion, which is effectively identical to its Rule 59 motion, this Court has expressly rejected it as a basis for a new trial.  *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 96-97 (2d Cir. 2014).

---

[11] BMW did not appeal the District Court's April 8, 2024 Memorandum and Order.

The District Court also correctly ruled that the Appellants "failed to make [any objections] at any of the charging conferences, *or upon publication of the jury's verdict and before the jury was discharged*." (SPA-94) (emphasis added).

## A. Legal Standard

Fed. R. Civ. P. 59 states, in pertinent part, that "[t]he court may, on motion, grant a new trial on all or some of the issues….after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Separately, Rule 59 allows a "motion to alter or amend a judgment." Fed. R. Civ. P. 59(e). However, a "motion under Rule 59(e) is neither an occasion for repeating old arguments previously rejected nor an opportunity for making new arguments that could have been previously advanced." *Hertz Global Holdings, Inc. v. Natl. Union Fire Ins. Co.*, 2022 U.S. Dist. LEXIS 54393, at *5 (S.D.N.Y. Mar. 25, 2022, No. 19-cv-6957 (AJN)) (citation and quotation omitted); *Feldman Law Group P.C. v. Liberty Mut. Ins. Co.*, 819 F. Supp. 2d 247, 266 (S.D.N.Y. 2011) (Rule 59 "does not provide a party with the opportunity to relitigate the merits of a case in an attempt to win a point already 'carefully analyzed and justifiably disposed.'"); *United States v. Various Arts. of Obscene Mdse., Schedule No. 615*, 1995 U.S. Dist. LEXIS 7019, at *2, n 2 (E.D.N.Y. Apr. 26, 1995, 95 CV 0584 (ARR)) (Rule 59 "does not provide a second opportunity for a losing party to present evidence which was available but not previously introduced").

-34-

In this case, BMW does not deny that their Rule 59 Motion is effectively a "do over" of their Rule 50 Motion ("for all the same reasons discussed in BMW's appeal of the directed verdict motion, supra § I., which are incorporated by reference herein"). *See* Appellants' Br. at 39. However, Rule 59(a)(1)(A) only permits a court to grant a new trial "if the verdict is against the weight of the evidence"; a burden which BMW has failed to meet. *See Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012). In order for "a district court to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or…the verdict is a miscarriage of justice, i.e., it must view the jury's verdict as against the weight of the evidence." *Smart v. United States Lab. for Hire, Inc.*, 2024 U.S. Dist. LEXIS 119658, at *18 (E.D.N.Y. June 26, 2024, No. 20-CV-5594 (TAM)) (citing *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003)). This Circuit has made clear it "decline[s] to sit in the place of the district judge in deciding whether [an appellant's] new trial motion should be granted." *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998).

"A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*, 290 F.3d 98, 106 (2d Cir. 2002) (internal quotation marks omitted). "It is well-settled that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new

-35-

theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'" *Sequa Corp. v. Gbj Corp.*, 156 F.3d 136, 144 (2d Cir. 1998). It is, thus, axiomatic that "a motion for a new trial under Rule 59(a) on the ground that the jury's verdict is against the weight of the evidence must overcome the 'high degree of deference . . . accorded to the jury's evaluation of witness credibility' and the admonition that 'jury verdicts should be disturbed with great infrequency.'" *Johnson v. Perry*, 763 F. App'x 81, 83 (2d Cir. 2019) (citing *ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97-98 (2d Cir. 2014)).

The standards by which a court must apply in a motion for a new trial also "depends on whether that party objected contemporaneously to the purported errors." *Marcic v. Reinauer Transp. Cos*., 397 F.3d 120, 124 (2d Cir. 2005). Where claimed errors were not preserved by objections contemporaneously at trial, a new trial will be granted only for error that was 'so serious and flagrant that it goes to the very integrity of the trial.'" *Marcic v. Reinauer Transp. Companies*, 397 F.3d 120, 124 (2d Cir. 2005) (citing *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 18 (2d Cir. 1996)).

### B. Boateng Demonstrated Sufficient Evidence to Support the Jury's Verdict

BMW's barebones argument in support of its Rule 59 Motion is effectively a renewal of its Rule 50 Motion. Appellants' entire argument was stated as follows:

> Here, the District Court should have granted BMW's motion for a new trial on the GBL 349 claim, pursuant to Rule 59, for all the same reasons discussed

in BMW's appeal of the directed verdict motion, supra § I., which are incorporated by reference herein. The District Court should have freely weighed the trial record, and after so doing, determined that the jury's verdict on the GBL 349 claim was seriously erroneous, such that a new trial was warranted.

*See* Appellants' Br. at 39.

It is respectfully submitted that no prejudicial errors exist. BMW's paltry claims that "insufficient evidence" was presented is a smokescreen for its own failures to demonstrate what particularly was insufficient about the evidence other than broadly alleging it was "insufficient." Although it is not Boateng's burden to meet, it should be noted that the Appellee called seven witnesses[12] over the course of five out of the seven trial days.

Boateng demonstrated *by a preponderance of the evidence* that he suffered from a "consumer injury" and that BMW's practices were materially misleading. The jury concluded that BMW's conduct was deceitful. "Further, a jury could determine that a reasonable consumer would have relied on" BMW's representations that SCAD was safe to use in a position such as the one Boateng found himself in at the time of the accident. *Anunziatta v. Orkin Exterminating Co., Inc.*, 180 F. Supp. 2d 353, 362 (N.D.N.Y. 2001). Thus, as discussed in Appellee's Opposition to BMW's directed verdict motion, *supra* § I, the Court must deny BMW's appeal.

---

[12] The seven witnesses include: Tonya Perry, Godwin Boateng, James Pugh, Dr. Ari Hoschander, Dr. Jacob Rauchwerger, Neil Guthrie and Klaus Bruecklmeier.

### C. BMW Was Not Prejudiced by Boateng's Use of Evidence Which BMW Produced in Discovery, and Did Not Object to its Admission in Evidence

BMW shamefully accuses that "the jury likely was *materially swayed by counsel's misleading presentation*, over BMW's strenuous objections, about differences in the number of claims indicated in three different documents (each with a different genesis and scope), as a deceptive act upon consumers." *See* Appellants' Br. at 40 (emphasis added). Appellants' unsubstantiated accusations reek of desperation. Notwithstanding the fact that there was nothing "misleading" about Boateng's counsel's trial presentation, the District Court instructed the jury multiple times that counsel's arguments about credibility or the evidence, including stipulations such as the joint exhibits—*which BMW's counsel prepared alone*—was not evidence that the jury may consider in deciding the case. (JA 1619-1620).

Additionally, each KBA document translated from German to English, which BMW presumably complains of as being at the foundation of the purported "discovery dispute," was previously ruled upon in the District Court's *in limine* Order. To reiterate, the Appellants did not appeal that Order. (SPA 1-38). More importantly, BMW did not object at trial when Boateng introduced and moved <u>any</u> of the documents into evidence. To the contrary, BMW *consented* to those exhibits coming in. *See, e.g.,* JA-642 (moving in trial exhibit 98); JA 1070-1071 (moving in trial exhibit 99); JA-1107 (moving in trial exhibit 100); JA-993 (moving in trial exhibit 101); JA-1124 (moving in trial exhibit 103); JA-1091 (moving in trial exhibit

104); JA 1130-1131 (moving in trial exhibit 105); JA-1079 (moving in trial exhibit 106); JA-1090 (moving in trial exhibit 107); JA-990 (moving in Joint Ex. 1); JA-985 (moving in Joint Ex. 2).

In response to Appellants' post-trial motion concerning any claims of impropriety, the District Court determined as follows:

> In conclusion, the Court does not find Plaintiff's counsel's line of questioning regarding the differing numbers of injuries to be improper. BMW AG *provided differing responses* to very similar questions posed by the KBA and by Plaintiff, and to the extent there was a reason for those differing responses, *Plaintiff's counsel properly sought to question BMW's witnesses about those differences*. *Defendants made a strategic decision* to limit the scope of their response to Plaintiff's interrogatories in discovery, and that strategic decision provided Plaintiff with an opportunity to question Defendants' witnesses regarding the differing numbers at trial.

(SPA-109) (emphasis added).

As such, there is no merit in BMW's suggestions that the inconsistent injuries reported within the interrogatory responses was somehow a manufactured "discovery dispute" contrived by counsel. It certainly did not form the basis of BMW's "'deceptive act' for purposes of [Boateng's] GBL § 349 claim," as the District Court concluded. (SPA 109-110). The fact that BMW is "now unhappy with how [the District] Court utilized a document that [was] entered into evidence is not a basis for granting a new trial." *Barnes v. Alves*, 304 F.R.D. 363, 367 (W.D.N.Y. 2015). "The jury was free to assess the credibility of the witnesses and to weigh the conflicting evidence [on BMW's GBL 349 violations] in favor of the plaintiff."

*Kirschner v. Off. of Comptroller*, 973 F.2d 88, 95 (2d Cir. 1992). *See also, Meide Zhang v. Liang Zhang*, 2019 U.S. Dist. LEXIS 24372, at *9 (S.D.N.Y. Feb. 14, 2019) ("jury was free to weigh the conflicting evidence as it saw fit"). Even in the absence of inconsistencies, a "court will not inquire into the jury's deliberative process, including arguments, statements, discussions, mental and emotional reactions, and votes, in the absence of external influence." *United States v. Kopp*, 2007 U.S. Dist. LEXIS 37533, at *9 (W.D.N.Y. May 23, 2007, No. 00-CR-189A) (citing *United States v. Ford*, 840 F. 2d 460, 465 (7th Cir. 1988)).

In their appellate brief, *see* Appellants' Br. at 40-41, BMW discusses its perceived inconsistency of the reported claims, even though it was afforded an opportunity at trial to cross-examine witnesses and cure any potential juror confusion. BMW reviewed the KBA trial exhibits with Neil Guthrie, and he described BMW's input into the joint exhibit, the reasons his reported numbers differed from the joint exhibit, and how many vehicles were produced with SCAD. (JA 1005-1008). Bruecklmeier, too, was questioned about the joint exhibits and testified that there were additional BMW models with SCAD not contemplated in the joint exhibits. (JA 1156-1157). As such, BMW availed itself of the opportunity to explain the disparity in reported claims to the jury. The jury heard this testimony and weighed the evidence carefully.

BMW also argues that their objections at sidebar as to this issue were overruled. *See* Appellants' Br. at 42. However, these were not evidentiary objections and were properly overruled. If BMW was unprepared at trial, that is its counsel's fault.

Moreover, the number of reported claims presented to the jury was only admissible for the purpose of notice to BMW, as made clear in the Court's *in limine* Order. Boateng stayed within bounds of the Order. Tellingly, it is BMW who ran afoul of the *in limine* Order by arguing the details of other claimants in their Rule 50 Motion. *See* Appellants' Br. at 22-23. Even if there was any merit to the Appellants' claims—which there is not—BMW failed to properly object by requesting a new trial or moving for a mistrial. *United States v. Melendez*, 57 F.3d 238, 243 (2d Cir. 1995) ("the absence of [an object or motion for a mistrial] provides some indication that the improper remark was not perceived as rendering the trial unfair and may indicate that defense counsel preferred to have this jury decide her client's fate"); *Kappen v. Bell*, 2022 U.S. Dist. LEXIS 57225, at *9 (E.D.N.Y. Mar. 28, 2022, No. 18-ev-05784(CBA)) ("trial court denied the motion for a mistrial because [the party] had failed to timely object to the admission of the videotape and any defects in the video recording went only to the credibility of the evidence, not its admissibility"); *Bodine v. Brunelle*, 1999 U.S. Dist. LEXIS 21529, at *34 (W.D.N.Y. May 14, 1999,

-41-

97-CV-57S(F)) ("A party's failure to timely object or to move for mistrial may be one indication that the misconduct was not so severe as to warrant reversal").

Accordingly, this branch of the Appellants' Brief must be denied. *Sorenson v. Wolfson*, 2015 U.S. Dist. LEXIS 88401, at *7 (S.D.N.Y. July 7, 2015).

### D. The Damages Awarded By the Jury Was Not Excessive, and a Remittitur or New Trial on Damages is Not Warranted

BMW has repeatedly trivialized, marginalized and minimized Boateng's injuries throughout these proceedings. Ironically, BMW's own expert, Mathew Greenston, admitted he "removed the fuse for the soft close so that it was disabled," to prevent an injury to the individual reenacting Boateng's injury. (JA 865-866). Regardless, BMW has failed to demonstrate that the award was excessive, and the District Court providently exercised its discretion in refusing to reduce the verdict. *See Attridge v. Cencorp Div. of Dover Tech. Intern., Inc.,* 836 F.2d 113, 117 (2d Cir. 1987) ("A trial court's refusal to reduce a jury award will be accorded substantial deference, and will be reversed only for abuse of discretion").

### 1. The Jury Award as to Lost Wages, as Affirmed by the District Court, was Correct and is Supported by the Trial Record.

The District Court confirmed that the "jury's award of damages for past lost wages in the instant case--$255,360--was based on a simple calculation made by Plaintiff during his testimony." (SPA 112). As such, the District Court did not find "an award of damages for 56 weeks to be speculative," as Appellants suggest. (SPA

114). The District Court also expressly rejected the Appellants' claims concerning Boateng taking home 100% of the gross receipts under his "pass-through entity" status. The District Court cited to *McKee v. Colt Elecs. Co.*, 849 F.2d 46, 49 (2d Cir. 1988) in support ("under New York law the calculation of future lost wages as a component of a plaintiff's damage award must be based on projected gross earnings with no consideration of after-tax income either allowed into evidence or charged to the jury.") (SPA 117-118).

The District Court also calculated there to be "60 weeks between July 6, 2016, and August 30, 2017," and that 56 weeks was "a reasonable approximation of the number of weeks for which Mr. Boateng lost wages, based on the trial evidence." (SPA 115). The District Court then recognized that "Per Mr. Boateng's contract with Stango, he would have been entitled to $117 per hour for all work performed between September 19, 2016, and December 28, 2016, and at the same rate for any hours worked thereafter 'until a new agreement [was] reached' between Stango and the client." (SPA 116). Based on these facts alone, the District Court concluded that "if anything, $114 per hour *understates* Mr. Boateng's lost wages in 2016." (SPA 116) (emphasis added).

Contrary to BMW's suggestion, there was no gap in time between the two contractors that retained Boateng. Boateng testified clearly that although he "might be working for different companies, [] the client is the same. The client is the US

-43-

Army." (JA-295). Boateng also explained that while he may have signed a contract with SMS and went to work for a few days on May 22, there was an "understanding that when I come in I might not be able to fully do everything. But they wanted me to be there for the beginning of that particular project. You know, they wanted me to be there." (JA 295-296). Certainly, BMW did not identify any gaps in time between projects from one to the next. (JA-154).

Instead, BMW's argument in support of reducing Boateng's lost wages award revolves around BMW's *own speculative interpretations* of the evidence which it did not present at trial. Appellants had the opportunity at trial to cross-examine Boateng and clarify any purported miscalculations. They failed to do so. Additionally, BMW suggests that because Boateng's contract with Stango & Associates expired on December 28, 2016, it would be presumptuous to assume he would have worked past that date. *See* Appellants' Br. at 50-51. Notwithstanding the fact that Boateng was due a pay increase to $117 per hour under the Stango contract, (JA 1965-1968), in reviewing the last paragraph of the first page of trial exhibit 29, the jury likely concluded that if Stango did not finalize a new agreement with the U.S. Military prior to December 28, 2016, "then the current rate [of $117 per hour] will stay in effect until a new agreement is reached." (JA 1965). Furthermore, Boateng expressly testified that had he not been injured on July 6,

2016, he would have continued working at Stango because he had "a five-year contract," where the hourly rate "might have gone up." (JA 302).

BMW also falsely states that Boateng "returned to fulltime work by mid-June." *See* Appellants' Br. at 47. Boateng's trial exhibit 130 (JA-2118) is a purchase order dated June 2, 2017 for SMS to purchase 899 anticipated hours of work from Boateng's consulting company, GAB. The purchase order references the consulting agreement signed on May 3, 2017. (JA-2118). This document did not establish that Boateng returned to work in May 2017. Likewise, Boateng's trial exhibit 131 suggests that Boateng may have returned briefly to work for two weeks between June 16, 2017 and June 30, 2017. (JA-2119). However, Boateng had a second surgery scheduled with Dr. Hoschander for June 29, 2017. (JA-2165). Boateng testified it took him three or more weeks to recover. (JA-287). Regardless of when he actually signed his contract with SMS, Boateng testified he began working full-time "*somewhere in August* because I worked there for a while. I got my second surgery around, I think June 20th [sic] and then I took some time to heal." (JA 164-165) (emphasis added). Boateng made clear that he was "talking about August of 2017" when he returned, and most likely "late August I went back." (JA 165).

Thus, BMW's argument that Boateng did not miss 13 months of work is a selective interpretation and repackaging of the evidence. The evidence clearly demonstrates that, with the exception of two weeks worked in June, Boateng missed

13 months (July 6, 2016 through end of August 2017). As the District Court appropriately concluded, "[t]here are 60 weeks between July 6, 2016, and August 30, 2017," and that 56 weeks is "a reasonable approximation of the number of weeks for which Mr. Boateng lost wages, based on the trial evidence." (SPA 115).

Furthermore, BMW wishfully argues that Boateng's lost income should be calculated at the rate of $110 per hour. Boateng testified that the only reason he was paid less—beginning in June 2017—was because the contractor changed; a seemingly irrelevant issue, since Boateng did not begin getting paid at the $110/hour rate until June 16, 2017. (JA 166-167). Appellants further argue that although the District Court deemed GAB a "pass-through entity," it "was not Boateng's testimony" that this was how he structured his company. *See* Appellants' Br. at 50. To the contrary, this was <u>precisely</u> Boateng's testimony. (JA 414-415) ("if you look at the gross from both, they are different. *<u>The rest is passed on to me</u>*. The numbers are different") (emphasis added).

BMW's remaining arguments as to "how much GAB would have grossed, or what business expenses it would have incurred had Boateng never been injured" were not raised by BMW at trial. Accordingly, for Appellants to raise these purported miscalculations for the first time here is improper. Based on the foregoing reasons, the District Court's Order must be affirmed.

-46-

For these reasons, BMW's request for a remittitur of damages as to lost wages must be denied in its entirety.

**2.** ***The Past and Future Pain and Suffering Award, as Affirmed by the District Court, was not Excessive.***

As an initial matter, Appellants' beliefs that the damages awarded were excessive is belied by the fact that BMW <u>failed to call any expert witnesses</u> to rebut Boateng's evidence or the testimony of the two doctors Boateng called to testify at trial: Dr. Ari Hoschander and Dr. Jacob Rauchwerger. Here, the "jury was entitled to credit and rely on the testimony of [Boateng] and [his] expert[s] to calculate damages" when making its "factual determinations." *Toporoff Engineers, P.C. v. Fireman's Fund Ins. Co.*, 371 F.3d 105, 109 (2d Cir. 2004). As such, the "high threshold for disturbing a jury verdict was not reached in this case." *Id*. at 108.

BMW listed Dr. Jack Choueka as its expert witness in the April 12, 2024 filed Joint Pretrial Order. BMW designated Dr. Choueka in the hopes that he would "testify concerning the matters in his report in this case and to discuss, generally, the thumb injury, the treatment received by Mr. Boateng and his opinions concerning the claims of permanency." *See* ECF Doc. No. 159, pgs. 10-11, ¶ 4. By all indications, BMW intended to call Dr. Choueka to refute Boateng's claims as to the permanency of his injuries, pain and suffering and disfigurement. Inexplicably, BMW reversed course and notified the Court on June 24, 2024, that they would not be calling Dr. Choueka:

MR. SEMPREVIVO: Then for tomorrow, we have Nathan Dorris coming in. And we conferred on our team here over the weekend. We had Dr. Choueka coming in. He's a witness tomorrow. **But given the testimony of the two medical doctors from plaintiff, and the cross-exam and direct exam, we don't see his testimony as anything but cumulative**. **It's a very straightforward injury.** So we will not call Dr. Choueka so it should allow us to definitely finish tomorrow.

(JA 953-954) (emphasis added).

It is respectfully submitted that BMW's failure to call its medical damages expert as a witness precludes them from seeking a new trial on the grounds that the damages awarded were excessive. *Chnapkova v. Koh*, No. 88 Civ. 6144, 1992 U.S. Dist. LEXIS 5878, at *5 (S.D.N.Y. Apr. 28, 1992) ("defendant had an examination of plaintiff conducted by another expert, but failed to call that doctor as a witness"). Further, if it was truly a "straightforward injury," as Appellants' counsel suggested, BMW cannot complain about the jury award now. BMW had the opportunity to present a defense regarding pain and suffering damages, yet they *waived* that right.

The District Court correctly decided that the jury's award of $1.65 million for past and future pain and suffering was not excessive, as it did not materially deviate from reasonable compensation when compared to similar cases. (SPA-118). The District Court considered the nature of Boateng's injury, which involved a crush injury and partial amputation, his limitations and the permanent pain he endured. (SPA-126). The District Court also appropriately distinguished the unanalogous cases cited by the Appellants (SPA-123) ("the Court finds that *Gonzalez, Hudson*,

and *Villalba* each differ sufficiently factually from the instant case, either in mechanism and type of injury or in evidence provided to the court to distinguish them from the instant case"). Instead, the District Court found that "the New York case cited by Plaintiff's opposition memorandum [to be more instructive] because it involves a crush injury, similar to the instant case." (SPA-124).

Boateng alerted Appellants to the award in *Class v. Steering Wheel Rentals, Inc.*, JVR No. 378343, 2000 WL 1515708 (N.Y. Sup. Ct. 1995) in the proposed Joint Pretrial Order months prior to the trial on February 9, 2024, which the Appellants dismissed as "improper." (JA-2850). As the District Court acknowledged, the plaintiff in *Class v. Steering Wheel Rentals, Inc.*, JVR No. 378343, 2000 WL 1515708 (N.Y. Sup. Ct. 1995) sustained a "'finger amputation when the cargo door slammed shut on his hand' and was awarded $1.5 million in pain and suffering, which would approximate $2.7 million when adjusted for inflation as of June 2024." (SPA-124 citing JA-2894). The District Court was persuaded by the comparable "crush injury" Boateng suffered. Conversely, it was not persuaded by BMW's characterization that Boateng "'merely' lost the 'tip' of his thumb" after considering "Dr. Hoschander's description of the injury as a crush injury with 'partial amputation.'" (SPA-125).

In its Order, the District Court underscored two cases it independently reviewed as comparable jury awards. (SPA-125). In *Ramos v. City of New York*,

-49-

891 N.Y.S.2d 385 (1st Dep't 2009), the plaintiff sustained an injury to his nondominant hand and was awarded $4 million, which was reduced on appeal to $1.35 million. The District Court concluded that when "[a]djusted for inflation, the reduced award would be approximately $1.9 million as of June 2024." (SPA-125). The District Court also found persuasive *McKeon v. Sears, Roebuck & Co.*, 690 N.Y.S.2d 566 (1st Dep't 1999), where the plaintiff's four fingers were amputated but reattached. The District Court deemed this to be "a more favorable prognosis than Mr. Boateng." (SPA-126). The District Court observed that the New York Appellate Division affirmed the $1.35 million award, "which would be approximately $2.6 million adjusted for inflation as of June 2024." (SPA-126). Accordingly, the District Court appropriately denied BMW's request for remittitur, as the jury's award for pain and suffering was within the range of reasonable compensation under New York law, as they were "at least as severe as those suffered by the plaintiffs in *Class* and *Ramos*." (SPA-127).

BMW also falsely argues in its Brief that Boateng "presented no evidence at trial of any percentage of disability in his right hand." *See* Appellants' Br. at 53. Dr. Jacob Rauchwerger clearly testified that a "thumb is the most important digit on your hand, [and] by the way…*if you lose part of your thumb, you're already considered 40 percent disabled already just to start*." (JA 774-775) (emphasis added).

Dr. Ari Hoschander, Boateng's surgeon and designated medical expert witness, testified on June 20, 2024 concerning Boateng's prognosis and permanency of injury as follows:

> Q. Have you reached any medical conclusions regarding the long-term affects from Mr. Boateng's injury?
> MS. CAMILLERI: Objection, your Honor.
> THE COURT: I believe he's allowed to testify to this, his opinion, about long-term.
> MR. COHEN: Yes, that's all I'm asking for.
> THE COURT: Overruled.
> A. In general, you want your fingers to be full length because that's the way your body was made. If you have an injury that shortens one of them, especially one that is important -- how would I define important, I would definite [sic] your dominant side, that is step one in importance. In this case Mr. Boateng's right hand is his dominant side, that's significantly more important than his left. Length is a second thing that would be important. So if any finger is shorter than what it was supposed to be or what it was, it will decrease your ability to do certain things by a certain amount. What percentage exactly, it's impossible to say. Pain, if somebody is having significant pain at their fingertips, it would make daily activities extremely difficult. Strength or range of motion, again, would be things that if they were limited would limit your ability to use your dominant hand and it could significantly affect your life.
> Q. In your opinion is this a permanent injury?
> A. Yes.
> Q. And what are the chances that his pain forever goes away at some point in time?
> A. At this point, we're almost seven years after the last time I saw him, in general time heals a lot of things [sic], but if it's been seven years and he's still having pain and having difficulty with regular things, I doubt it will get any significant amount better with more time. Seven years is a long time in the scale of healing. He's pretty much where he'll be.
> Q. Almost eight yours [sic].
> A. Almost eight years.
> Q. What is the medical likelihood of the permanency of Mr. Boateng's limitation to type and use a mouse for a keyboard?
> A. It's likely that whatever he's at now is going to be the way he is forever.

(JA 542-544).

Dr. Hoschander also testified that the length of Boateng's thumb permanently limited his use of a keyboard in his job as a software engineer. (JA 547). Boateng had to relearn and alter the way he typed. (JA 374). Dr. Hoschander also opined that there were no treatments to minimize Boateng's pain any more than they attempted. (JA 548-549). Boateng's *permanent* loss of function and use of his thumb includes, among other things, a "[d]ecreased ability to do normal activities due to pain and length, shortened length." (JA 551-552). Boateng also "100 percent sustained a disfigurement of his thumb."[13] (JA 552). Moreover, Dr. Hoschander concluded that "if he's still having pain seven to eight years after the initial injury, it's likely he will have a sustained level of pain permanently to some degree with minimal improvement at this point." (JA-554).

At no point in time did BMW challenge either Dr. Hoschander's or Dr. Rauchwerger's opinions concerning the permanency of Boateng's injuries. Nor did BMW present their own expert witness in rebuttal. As such, the Court must be mindful that in reviewing a claim where it is alleged that a jury's damages award was excessive, it must "accord substantial deference to the jury's determination of

---

[13] BMW's counsel's observations that "the appearance of Boateng's thumb is not entirely disfigured," is inappropriate and irrelevant. *See* Appellants' Br. at 56. As discussed, BMW was free to call their medical expert to offer a medical conclusion concerning Boateng's disfigurement but failed to do so.

factual issues." *Martell v. Boardwalk Enters.*, 748 F.2d 740, 750 (2d Cir. 1984). Furthermore a "trial judge is not called upon to say whether the amount is higher than [they] personally would have awarded." *Dagnello v. Long Island R.R.*, 289 F.2d 797, 806 (2d Cir. 1961). The $800,000 in past pain and suffering, $850,000 in future pain and suffering and $255,360 in lost wages in this case "was justified by the evidence, 'was fair and reasonable, and did not shock the conscience." *Lore v. City of Syracuse*, 670 F.3d 127, 179 (2d Cir. 2012) (citation omitted).

Appellants also argue that the cases they cited were instructive. However, the District Court properly considered and distinguished BMW's cases. For instance, *Villalba v. Rockford Sys.*, 2006 U.S. Dist. LEXIS 11470 (E.D.N.Y. Feb. 10, 2006, No. 02-CV-4455 (ARR) (RML)) is wholly distinguishable, in that it was <u>not</u> a jury verdict but an award pursuant to an inquest due to the defendant's default. For this reason alone, the *Villalba* court considered jury verdicts from other decisions. *Id*. at **11-14.

BMW also conveniently cherry-picks cases in which a jury returned a lesser verdict as evidence that somehow the jury award in this case was excessive. Notably, BMW cites five cases in support of remittitur which were decided in the years 2001 (*Gonzalez v. Delta International Machinery*, No. 33704/98, JVR No. 385889, 2001 WL 1136768 (N.Y. Sup. Ct. Mar. 1, 2001)), 2006 (*Hudson v.*

*Lansingburgh Cent. School Dist.*, 27 A.D.3d 1027 (N.Y. App. Div. 2006)), 2006 (*Villalba v. Rockford Sys., Inc.*, No. 02-CV-4455(ARR)(RML), 2006 WL 526660 (E.D.N.Y. Mar. 3, 2006)), 2007 (*O'Shea v. State*, No. 101626, 2007 WL 494635 (N.Y. Ct. Claims Jan. 22, 2007)), and 2012 (*Robinson v. N.Y.C. Dep't of Educ.*, 94 A.D.3d 428 (N.Y. App. Div. 2012)), respectively. *See* Appellants' Br. at 51-54.

Even if the jury verdict awarded to Boateng was comparatively larger than the cases BMW cites, thus testing "the boundaries of proportionality and predictability," nonetheless, the jury's "compensatory award was fair and reasonable." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 163 (2d Cir. 2014). For these reasons, BMW's request for a remittitur of damages due to its excessiveness must be denied in its entirety.

As such, the District Court's Order and jury verdict must be affirmed.

## **CONCLUSION**

For all of the foregoing reasons, Appellee respectfully requests that this Court affirm the District Court's Order and jury verdict, and deny BMW's appeal for a (i) directed verdict, pursuant to Fed. R. Civ. P. 50(b); (ii) pursuant to Fed. R. Civ. P. 59, to set aside the liability verdict on the Appellee's New York General Business Law § 349 ("GBL 349") claim or to grant a new trial on that claim; and/or (iii) for remittitur of the excessive damages awarded to Boateng or to grant a new trial on damages, in its entirety, and grant Boateng costs, disbursements and reasonable

attorneys' fees, and for such other and further relief as this Court deems just and proper.

Dated:     April 7, 2025
           Valley Stream, New York

                        Respectfully submitted,

                        **A. COHEN LAW FIRM, P.C.**

               By:    */s/ Avinoam Cohen, Esq.*
                        AVINOAM COHEN, ESQ.
                        *Attorneys for Appellee Godwin Boateng*
                        11 Sunrise Plaza, Suite # 304
                        Valley Stream, NY 11580
                        Tel: (516) 341-7770
                        Avi@ACohenLawFirm.com

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

The foregoing brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because this brief contains 13,847 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 with 14-point Times New Roman font.

Dated:      April 7, 2025
              Valley Stream, New York

                 Respectfully submitted,

                 **A. COHEN LAW FIRM, P.C.**

By:   */s/ Avinoam Cohen, Esq.*
        AVINOAM COHEN, ESQ.
        *Attorneys for Appellee Godwin Boateng*
        11 Sunrise Plaza, Suite # 304
        Valley Stream, NY 11580
        Tel: (516) 341-7770
        Avi@ACohenLawFirm.com

## <u>CERTIFICATE OF SERVICE</u>

I, Avinoam Cohen, attorney for the plaintiff-appellee, do hereby certify that on the 7th day of April, 2025, a true copy of the foregoing Appellee's Brief will be filed through the ACMS system and sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be served via first-class mail, postage prepaid, upon anyone indicated as a non-registered participant.

Dated:  April 7, 2025
     Valley Stream, New York

            */s/ Avinoam Cohen, Esq.*
            AVINOAM COHEN, ESQ.